[No. 28086. Department One. May 16, 1941.]

THE STATE OF WASHINGTON, *Respondent,* v. ARNOLD
LEVY, *Appellant.*[1]

[1]Reported in 113 P. (2d) 306.

*Tom W. Holman, Harold A. Pebbles,* and *Stiger & Stiger,* for appellant.

*Ralph Smythe* and *Max Church,* for respondent.

STEINERT, J.—An information filed by the prosecuting attorney of Clallam county charged defendant, Arnold Levy, formerly a county commissioner of that county, with the perpetration of eight crimes as set

forth in an equal number of separate counts involving, in the aggregate, alleged misappropriations of public funds, forgeries, and grand larcenies. Application by defendant for change of venue was granted, and the action was transferred to Snohomish county, and was there subsequently tried before a jury.

As to count three, which charged defendant with being an accessory to misappropriation of a particular sum of money by a former county treasurer of Clallam county, the prosecutor, at the beginning of the trial, announced that he would offer no proof; and upon that count the jury, at the direction of the court, returned a verdict of not guilty. As to counts four, five, and six, which involved grand larcenies of title to, and possession of, certain parcels of county real estate, the court sustained defendant's challenge to the sufficiency of the evidence, and the jury, at the direction of the court, returned a verdict of not guilty as to each of those three counts.

The four remaining counts, namely, counts one, two, seven, and eight, were submitted for consideration and decision by the jury. Upon count two, which charged defendant with forgery in the first degree, in connection with a written application for the purchase of certain county real estate, the jury returned a verdict of not guilty. At the same time, the jury returned a verdict of guilty upon count one, which charged defendant with the crime of misappropriating public funds, committed by aiding and abetting the former county treasurer in the misappropriation of two hundred twenty-five dollars of such funds to the use of the treasurer and of the defendant, and also returned a verdict of guilty upon counts seven and eight, each of which charged defendant with the crime of forgery in the second degree, in that, as county commissioner, he, with intent to injure and defraud, had failed to enter

upon the proper records certain orders, required by statute, relative to the sale of real property owned by the county. A motion by defendant, for arrest of judgment, or, in the alternative, for new trial, was denied, and the court entered judgment of conviction and sentence. Defendant appealed.

At the times herein mentioned, appellant, Arnold Levy, was one of three county commissioners of Clallam county, and, as such, was serving his second term of office, which was to expire in January, 1941. At the same time, one Walter A. Baar, who had been a county officer of Clallam county for many years, was the duly elected county treasurer, holding office until January 9, 1939, on which date he was to be succeeded by one William Gilliam.

The facts which gave rise to the charge contained in count one, misappropriation of public funds, are as follows: In October, 1938, appellant cashed his personal check for one hundred and twenty-five dollars in the office of the county treasurer. Some time in December of that year, he sought to have another personal check cashed, at the same office, in the sum of one hundred dollars, and was then informed by the cashier that his former check had never been deposited in bank, but was still in the treasurer's possession. At appellant's request, the first check was thereupon returned to him, and he then gave his check for two hundred twenty-five dollars, which represented the amount of his former check and the additional sum of one hundred dollars which he at that time received in cash. The latter check was undated, and was never deposited in the bank by Baar, the treasurer, during his term of office.

One of the statutory duties of the several boards of county commissioners, enjoined by Rem. Rev. Stat., § 4056 [P. C. § 1664], is to audit the accounts of all

county officers having the care, management, collection, or disbursement of any money belonging to the county. On January 3, 1939, and again on January 5 of the same year, James E. Mansfield, one of the county commissioners then serving with appellant, having theretofore, as such commissioner, counted the cash in the treasurer's office, informed appellant that his check was in the treasurer's possession, and that it should be taken out.

When the county treasurer's office was opened on the morning of Monday, January 9, 1939, which was the day of expiration of Baar's term as treasurer, it was discovered that the safe in the cashier's compartment had been broken open and looted, and a number of checks and other papers which had been kept in the safe were found strewn upon the floor. Among them was appellant's check for two hundred and twenty-five dollars. The looting of the safe precipitated an investigation of the affairs of Clallam county, and, as a result, a number of county officers were prosecuted for, and convicted of, crimes similar to those involved here. Count one represents one of the series of prosecutions. The issue upon that count was whether the transactions involving appellant's checks were ordinary bona fide transfers of negotiable instruments, or whether they amounted to unauthorized loans of public money by the treasurer to appellant.

Counts seven and eight, although likewise resulting from the investigation that was made concerning the county's affairs, were wholly unrelated to the facts involved in count one. The essential facts as to count seven are as follows: One J. S. Kirschberg, appellant's second cousin, a resident of Los Angeles, California, had for some time been in the habit of making visits to Port Angeles, in Clallam county. While on one of such trips, he became interested in the possible purchase of

certain tax-title property owned by the county. Before leaving for his home, on that occasion, he instructed appellant to have the county treasurer put up for sale certain of such tracts of land, and to specify certain amounts as his, Kirschberg's, bids therefor.

Appellant complied with Kirschberg's request, and the county treasurer, on September 8 and 9, 1937, signed Kirschberg's name on customary forms of application for such sales, inserting the proper descriptions and the amounts bid as specified by Kirschberg. The usual cash deposits accompanied the applications. The treasurer then submitted the applications to the board of county commissioners, and the board, acting through two of its commissioners, including appellant, formally approved them by written endorsement. The board, however, did not enter an order fixing a minimum price of sale or directing sale by the county treasurer, as required by Rem. Rev. Stat. (Sup.), § 11294 [P. C. § 6882-133] (Laws of 1937, chapter 68, p. 233, § 1). The failure to enter such orders is the basis of this particular charge.

The treasurer nevertheless published notices of sale of the lands, in which notices the bids made by Kirschberg were specified as the minimum prices at which the lands would be sold. At the sale held by the treasurer, Kirschberg was represented by Nattinger & Levy, a local real estate firm of which appellant, Levy, was a member. Kirschberg's bids were the only bids made, and the lands were accordingly sold to him at the prices specified by him in his applications.

Count eight was based on a factual situation somewhat similar to that in count seven. Prior to 1936, appellant, while holding the office of county commissioner, entered into a partnership with W. K. Nattinger, under the firm name of Nattinger & Levy, for the purpose of conducting a real estate and insurance

business in Port Angeles. In the summer of 1937, appellant, together with Nattinger and a number of county officers, including Walter A. Baar, the county treasurer, formed an investment corporation, under the name of Port Angeles Securities Company. Appellant was made one of the directors of that company.

Immediately after its organization, the corporation entered into a written contract with Nattinger & Levy, the partnership, under the terms of which agreement the corporation was to have its principal place of business in the office of the partnership, and the latter was to act as agent of the corporation in the purchase and sale of real estate. For such services, Nattinger & Levy was to receive as compensation a certain percentage of stock of the corporation, and was also to receive regular commissions upon the sales of corporate property.

Shortly thereafter, the board of directors, acting for the corporation, concluded to purchase certain parcels of real estate in Port Angeles which the county had theretofore acquired through tax foreclosures, and authorized its agent, Nattinger & Levy, to bid up to a certain amount therefor. Prior to that time, it had been the custom and practice of the county, under the order and direction of the board of county commissioners, to have applications for the purchase of tax-title property filed in the office of the county auditor. Shortly before the time involved in counts seven and eight, the custom and practice were changed, and applications were thereafter required to be made to the county treasurer, Walter A. Baar, who, at that time, was one of the stockholders and directors of the new corporation.

On June 11, 1937, the corporation, through its secretary, W. K. Nattinger, who was appellant's partner in the real estate and insurance business, filed with the

county treasurer an application to purchase certain county real property, and specified the amount of its bid therefor. A few days thereafter, appellant wrote to the then prosecuting attorney, asking to be advised whether or not the corporation, of which he, a county commissioner, was a director, could lawfully purchase such property. The prosecutor replied that, in his opinion, such purchase would not be unlawful, and it is not contended herein that the advice given was incorrect. The application thereupon took the same course as that which was followed in the applications involved in count seven, except that two commissioners *other* than appellant approved the application made by the corporation. A portion of the property described in that application was subsequently sold at public auction to the corporation for the proportionate amount of its original bid.

The trial of the action in its entirety consumed twelve days. The statement of facts comprises sixteen hundred pages of testimony and over two hundred and fifty exhibits, consisting, for the most part, of written documents. Appellant makes nineteen assignments of error, four of which recite, in the aggregate, fifty-seven subdivisional instances of alleged judicial error in commenting on the facts, detracting the attention of the jury from an orderly consideration of the proof, evidencing an indulgent and solicitous attitude toward the prosecution, and manifesting a harsh and impatient attitude toward the defense.

We have read the entire record carefully, and will say, at the outset, that none of the fifty-seven subdivisional claims has any merit whatsoever or is worthy of discussion. Of the nineteen numbered assignments of error, we limit ourselves to a consideration of those involving (1) appellant's motion for new trial, and

(2) appellant's challenge to the sufficiency of proof as to counts seven and eight.

The motion for new trial is based upon the fact that the trial judge, in the presence of the jury, declared defense counsel in contempt of court, summarily imposed a fine upon him, refused to accept his check in payment of the fine, and enforced instant payment of the penalty in cash, under threat of immediate arrest.

The facts in connection with this particular phase of the case are as follows: Near the end of the fifth day of the trial, and while the state's case was in progress, William Gilliam, the newly elected county treasurer, was on the witness stand. He testified, on behalf of the state, concerning certain matters connected with the check for two hundred and twenty-five dollars which appellant had given, and upon which appellant was charged in count one. Mr. Tom W. Holman, chief counsel for the defense, apparently considered the testimony given by Gilliam on direct examination as damaging to appellant. At any rate, he entered upon a vigorous cross-examination of the witness, with the view, apparently, of showing that his testimony was motivated by personal hostility and political enmity.

Because of the length of the cross-examination, we cannot here reproduce it in its entirety, but will quote only so much thereof as will sufficiently present the question to be determined:

"Q. [By Mr. Holman]. Who, if anybody, was present the first time that you talked with Arnold Levy about this check? A. [By witness Gilliam]. To the best of my recollection, it was Arnold Levy and myself. Q. Only two? A. Yes, sir. Q. A political enemy talking with a political enemy and asking for help, is that it? Mr. Smythe [Prosecuting Attorney]: If Counsel wants to testify, Your Honor, I submit he had better be sworn and take the stand. I object on the grounds that is not proper cross examination, and it is immaterial, and it is certainly outside the scope of the

examination of this witness. THE COURT: It assumes a state of facts of which at present there is no evidence. Q. You admit you and Arnold Levy were political enemies, do you not? A. We both ran on the same ticket, sir. Q. But you were actually against each other, were you not? A. I don't admit that, no sir. . . . Q. Haven't you made the statement that you would testify and thereby force Arnold Levy on the stand? Haven't you made that statement? A. I have not, sir. Q. Do you have a friendly feeling toward Arnold Levy? A. I certainly wouldn't call him an enemy of mine. I voted for him. Q. Yes, I understand, he was on the ticket; of course you voted for him. MR. SMYTHE: Does Counsel want to make a speech, or is he asking a question, Your Honor. THE COURT: I think the last remark of Counsel was uncalled for, and the remark is stricken and the jury is instructed to disregard it. . . . Q. I will restate the question. Now, do you say that you did or did not have a friendly feeling toward Arnold Levy at the time of these alleged conversations with him? A. I would say that I had a fairly friendly feeling toward him. Q. Fairly friendly? A. Yes. Q. What do you mean by 'fairly friendly'? A. Well, we certainly hadn't had any quarrel of any sort. Q. Oh. You were just trying to ride him into the penitentiary is all, isn't it? MR. SMYTHE: I object to that, Your Honor, Counsel is just trying to inject all of this into the record. THE COURT: The remark of examining counsel will be stricken, and the jury instructed to disregard it. My patience won't last forever. There is no call for that remark. MR. HOLMAN: Well, Your Honor, I think there is. I don't know whether I will be able to prove it or not. THE COURT: Anyway it is not permitted that you make it. Q. Now, this first conversation that you had, what time of day was it? A. I wouldn't remember, sir. Q. Oh, let's get the time of day,—morning, afternoon or evening? A. I couldn't state, sir. Q. Oh, Mr. Gilliam, a thing this vital and you cannot state? A man's integrity, and you can't state? THE COURT: Just a moment, Mr. Holman, I think these last two remarks of yours that are volunteered are improper, and involve no questions. They are argumentative. MR. HOLMAN:

I do not mean to be argumentative, Your Honor. . . . Q. Who told you that Arnold Levy had a check there? A. He broached the subject to me himself. Q. How did he broach it? A. Just what I stated awhile ago; he asked me about the check, what I was going to do about it. Q. Let me get this: Arnold Levy came to you, a political enemy, and told you he had a check there and asked you what you were going to do about it? MR. SMYTHE: Your Honor, he is trying to inject these prejudicial remarks into the record all the time, and I object, Your Honor.. THE COURT: The objection to this question is sustained, and I shall not caution you again, Mr. Holman. MR. HOLMAN: I shall endeavor to be more careful, Your Honor. THE COURT: Well, you will have to be. Q. Can you tell me the day of the week that this first conversation is alleged to have taken place? A. I cannot, sir. Q. Can you tell me what part of the week? A. I could not, sir. [Here follow further questions and answers as to the time and place of the alleged conversation.] Q. How was Arnold Levy dressed that day? [Objection overruled.] A. I couldn't state, sir. Q. Did Arnold Levy have his wife or family with him that day, Mr. Gilliam? A. Not to my knowledge. Q. He has a wife and family, has he not? A. I believe so. Q. Of what does it consist? [Objection sustained.] Q. Did Arnold Levy have a hat on that day? A. I don't recall, sir. Q. Sir? A. I don't recall, sir. Q. Did he have an overcoat on? A. I don't recall, sir. Q. Did he come out of the County Commissioner's room? A. I don't recall, sir. Q. Do you know whether he was going out or coming in when you accosted him or he accosted you? A. I do not, sir. .Q. Do you remember whether he accosted you or you accosted him? A. Well, I would state that he accosted me if you asked me that question about that. Q. Where was it,—opposite the Auditor's office, opposite the Treasurer's office, opposite the Assessor's office, or opposite the Commissioner's room? A. To the best of my knowledge it was between the Auditor's office and the Treasurer's office, sir. Q. A pretty safe bet, because they are on opposite sides of the hall. MR. SMYTHE: I object to the remark of counsel, Your Honor, on the ground it is argumenta-

tive. THE COURT: The remark of counsel is stricken. I will say this, the comment of counsel that this is a pretty safe bet is going to cost him $25.00, to be paid right now. MR. HOLMAN: I will have to give a check, Your Honor. I haven't the cash with me. THE COURT: I will not take your check. I mean it. MR. HOLMAN: I haven't that much money with me. THE COURT: The Sheriff will take him. MR. HOLMAN: I'll have to borrow it here. [At this point, the amount necessary to pay the fine was produced by counsel's assistant aided by appellant himself, and was handed to the clerk, all in the presence of the jury.] MR. HOLMAN: Your Honor, I respectfully ask that we be granted a recess. I can't continue now. I am unable to go on at this time. THE COURT: Well, maybe you will be ready tomorrow morning at nine-thirty, but you are not going to start in this way. Court will adjourn until tomorrow morning at half past nine o'clock."

Court then adjourned, at 5:10 p. m. The following morning, when court convened, the trial judge immediately, emphatically, and at some length instructed the jury that it should not allow the occurrence of the previous day to have any weight whatever in its consideration of the issues involved in the case. Appellant made no motion for mistrial until after the case had been submitted to the jury, seven days later.

 In considering appellant's motion for new trial, we will say, at the outset, that, had the trial court gone no further than to fine counsel for contempt, even though in the presence of the jury, we are convinced that the incident in question would not have constituted reversible error. Despite repeated and specific warnings by the court, counsel persisted in injecting improper statements into his cross-examination of the witness. The fine imposed by the court was invited, and, we think, was deserved. To that extent, a material distinction exists between the instant case and the cases of *State v. Coella*, 3 Wash. 99, 28 Pac. 28; *State*

642

*v. White,* 10 Wash. 611, 39 Pac. 160, 41 Pac. 442; *State v. Phillips,* 59 Wash. 252, 109 Pac. 1047, and *State v. Moneymaker,* 100 Wash. 463, 171 Pac. 253, upon which appellant relies very strongly. In none of the cited cases, was the action of the trial judge provoked by any improper conduct on the part of counsel, but was gratuitous on the part of the judge himself.

In the instant case, the incident was provoked by the attorney, and, in so far as the mere fining of counsel for contempt is concerned, it falls within the rule, recognized in this jurisdiction, that the administration to counsel of a merited rebuke or warning in the presence of the jury is not improper. *State v. Herwitz,* 109 Wash. 153, 186 Pac. 290; *State v. Elder,* 130 Wash. 612, 228 Pac. 1016; *State v. Johnson,* 141 Wash. 324, 251 Pac. 589; *State v. Cohen,* 143 Wash. 464, 255 Pac. 910; *State v. Boyd,* 150 Wash. 326, 272 Pac. 964. See, also, *State v. Neis,* 74 Wash. 280, 133 Pac. 444, and *State v. Birch,* 183 Wash. 670, 49 P. (2d) 921. Such must necessarily be the rule if the dignity of the court is to be maintained.

In cases where the specific question has been presented the courts have rather uniformly held that the fining of counsel for contempt, in the presence of the jury, is not reversible error. For a collection of cases on the subject, see Note (1912) 42 L. R. A. (N. S.) 428. However, while such action does not constitute reversible error, we are nevertheless of the view that it is preferable that, when such discipline becomes necessary, it be exercised in the absence of the jury, unless the circumstances demand instant action in order to preserve decorum or to maintain proper respect for the court.

Under the record as certified in this case, however, the incident here in question involved more than the administration of a rebuke or the imposition of a

fine. The court, after penalizing counsel, stated in the presence of the jury that it would not accept counsel's check in payment of the fine. It is difficult to see any connection between the requirement of payment of the fine in cash and preservation of the dignity of the court. We are satisfied, beyond any question, that the court's action was by no means based upon any doubt as to counsel's integrity, and we are somewhat at a loss to understand the trial court's insistence on cash payment. According to a memorandum opinion written in connection with the certification of the statement of facts, the trial judge was himself unable to explain why he should have refused counsel's check.

Ordinarily, of course, the only inference to be drawn from such a refusal would be that the court distrusted counsel, and the probability that the jury did draw that inference is so great that a very serious problem is presented, especially in view of the fact that this court has specifically held:

"Persons accused of crime have the right to be represented by counsel whose usefulness shall not be impaired by any unfavorable remark or critical attitude on the part of the trial judge in the presence of the jurors, who are quick to observe, and apt to receive, hostile impressions which deprive them of that fair and unbiased mental attitude which every juror should at all times possess in order to do justice between the state and the defendant at the bar. When a trial judge discredits counsel for the defense in a criminal case, he, to a certain extent, discredits the defense and thus deprives a defendant of a constitutional right. As was said in *State v. Phillips*, 59 Wash. 252, 109 Pac. 1047:

" 'The aid of counsel is guaranteed by the constitution to every person accused of crime, and this is universally recognized as one of the surest safeguards against injustice and oppression. Any conduct or statement on the part of the court that tends to impair the influence or destroy the usefulness of counsel is palpable and manifest error.'

"The language of the court here complained of was a rebuke to counsel and would clearly tend to put counsel in an unfavorable light before the jury, entitling the accused to a new trial before a jury not subject to such unfavorable influence or comment. *State v. White,* 10 Wash. 611, 39 Pac. 160, 41 Pac. 442." *State v. Moneymaker,* 100 Wash. 463, 171 Pac. 253.

Thus, the reflection on counsel's integrity, or, to be more accurate, the inference to that effect, clearly constituted error.

The mere fact, however, that error took place is not of itself determinative. To warrant reversal, it must further appear that prejudice resulted, or could reasonably be presumed to have resulted, from such error. *State v. King,* 67 Wash. 651, 122 Pac. 323; *State v. Hazzard,* 75 Wash. 5, 134 Pac. 514; *State v. Sullivan,* 97 Wash. 639, 166 Pac. 1123; *State v. Dale,* 115 Wash. 466, 197 Pac. 645; *State v. Washburn,* 116 Wash. 97, 198 Pac. 980; *State v. Stevens,* 135 Wash. 361, 237 Pac. 723; *State v. Gaines,* 144 Wash. 446, 258 Pac. 508.

In the instant case, there are a number of facts and circumstances which, when taken together, present an exceedingly close question as to whether prejudice actually did, or did not, result. In the first place, a reading of the entire record shows clearly that, throughout the long period of the trial, the court maintained a strictly impartial attitude on all matters relating to the merits of the case. Further, and with specific reference to the incident in question, the court instructed the jury, in very emphatic language, that the contempt incident was to have no bearing on its decisions; appellant took no exception to the court's action, nor did he promptly move for a mistrial, and the trial continued for an additional week; at the conclusion of the state's case, which took place subsequent to the incident in question, the court sustained a challenge to the sufficiency of the evidence as to three

counts; and, finally, the jury returned a verdict of acquittal as to one of the counts submitted to them. From this combination of circumstances, it might well be contended that no prejudice resulted.

On the other hand, it is to be noted that the incident in question arose at that stage of the proceedings when the particular witness under examination was testifying with respect to the charge contained in count one, involving the matter of a check given by appellant. One of the links in the chain of evidence upon which appellant's guilt in the transaction was sought to be established was the fact that, at all times between the day in December, 1938, when the check was given and January 7, 1939, the Saturday before the treasurer's safe was looted, appellant did not have sufficient funds in the bank to pay the check. It is also to be noticed that the trial judge and all the jurors were residents of Snohomish county, where the trial was held, while appellant and his chief counsel were residents of Clallam and King counties, respectively. In other words, the latter two were strangers, more or less, to the jurors.

Any question as to the worth of a check offered by one closely connected with the trial might well have made a lasting impression upon the jury, and the fact that the court refused Mr. Holman's check in payment of the fine might well have conveyed to the jury the thought that the trial judge had declined to accept the check because the judge knew, or suspected, that it would not be honored. This would naturally tend to reflect upon the integrity of counsel, create a hostile attitude on the part of the jury toward him, and place him in a position where his usefulness to his client would be seriously impaired. The record as a whole, and the diversity of inferences that could reasonably be drawn from the event, throw so much doubt on the

question of whether or not prejudice actually resulted to appellant that this court cannot positively affirm or deny that the occurrence had a prejudicial effect upon the jury against appellant.

As to what this court should do in such a situation, our prior decisions appear to be in conflict. Several of them clearly hold that it must appear affirmatively that prejudice resulted before reversal will follow. *State v. Daugherty,* 102 Wash. 501, 173 Pac. 437 ("Error is never presumed, and, on the contrary, the presumption must be that the proceedings were correct, where the record is susceptible of two constructions."); *State v. Lloyd,* 138 Wash. 8, 244 Pac. 130 (remarks complained of were addressed to the general venire, from which twelve jurors were missing, and it was held that there was no prejudicial error because there was no showing that the jurors in the case were not those absent when the remarks were made); *State v. Budreau,* 156 Wash. 103, 286 Pac. 51, 68 A. L. R. 1035 (". . . a state of facts must appear from which this court should presume that substantial rights of the appellant were prejudiced"); *State v. Foster,* 172 Wash. 201, 19 P. (2d) 918 (facts analogous to those in the *Lloyd* case, *supra*); and *State v. Birch,* 183 Wash. 670, 49 P. (2d) 921 (". . . we are justified in assuming that he [the trial court] was warranted by the circumstances in making the explanation").

On the other hand, in the cases of *State v. Wroth,* 15 Wash. 621, 47 Pac. 106, and *State v. Hyde,* 20 Wash. 234, 55 Pac. 49, this court refused to speculate as to the effect of the incidents there involved, and held that the presence of the judge in the jury room, and the reference by the court to the testimony of a witness, respectively, constituted reversible error, even though there was no affirmative showing of prejudice. Still other cases go even further, and contain express lan-

guage to the effect that error will be presumed to have been prejudicial:

" 'When incompetent evidence *may* have a tendency to arouse the prejudices of the jury, it cannot be deemed harmless.' 3 Rice, Evidence, p. 419d, and authorities there cited." *State v. Thompson,* 14 Wash. 285, 44 Pac. 533.

"Where an error is made which violates a constitutional provision, the judgment in a criminal case will ordinarily be reversed without a showing that said error did prejudice the rights of the defendant, unless the facts and circumstances be such that it affirmatively appears that such defendant was not, and could not have been, injured thereby." *State v. Manderville,* 37 Wash. 365, 79 Pac. 977; *State v. Dale,* 115 Wash. 466, 197 Pac. 645.

"The state's learned counsel, however, contend that there was an abundance of evidence to sustain the conviction outside of the objectionable evidence, and argue that its admission is, for that reason, not so far prejudicial as to require a reversal. But this court has no means of knowing what effect the erroneous evidence had upon the minds of the jury. It may have been the controlling factor that induced the verdict of guilty. Before the erroneous introduction of evidence can be regarded as nonprejudicial, it must clearly appear that it is so." *State v. Nist,* 66 Wash. 55, 118 Pac. 920, Ann. Cas. 1913C, 409.

It would seem that our cases can be rationalized only upon the following postulation: Conduct or remarks of the trial judge which are not reasonably calculated to influence the judgment of the jury will not be presumed to be prejudicial, and, on appeal, the burden is on the accused to show that prejudice actually resulted; in the case of conduct or remarks which *are reasonably* calculated to influence the judgment of the jury, however, prejudicial effect will be presumed, unless the contrary be shown. See 24 C. J. S. 849, § 1888(d).

■ The most obvious, if not the only, inference to be drawn from the trial court's refusal to take counsel's check being that the court distrusted counsel, the incident in question clearly belongs within the class of incidents the natural tendency of which would be to result in prejudice. In such a situation, this court should not speculate as to the actual effect of the trial court's actions and remarks, and we are therefore constrained to hold that the matter constituted reversible error.

For these reasons we are compelled to conclude, though with some reluctance, that the motion for new trial should have been granted.

We take up next appellant's challenge to the sufficiency of the proof as to counts seven and eight. The material portion of each of those counts reads as follows:

"That the said Arnold Levy . . . being at that time a duly elected, qualified and acting County Commissioner of the County of Clallam, . . . and being during all of said period charged with the duty of entering and causing to be entered upon the records of the said County Commissioners, orders fixing minimum prices below which the real property belonging to the said County should not be sold, and directing the County Treasurer to sell such portions of such property as the County Commissioners might determine to sell from time to time, did willfully, unlawfully and feloniously with intent to injure and defraud, fail to make a true entry or any entry whatsoever of an order fixing a minimum price below which [the property as described] should not be sold; and further failed to make a true entry or any entry whatsoever of an order directing the Treasurer of Clallam County, . . . to sell the said real property, in accordance with the laws of the State of Washington; . . ."

The information, it will be seen, merely charges appellant, *individually*, with failure to make a true, or any, *entry* of an order fixing the minimum prices be-

low which the property should not be sold, and of an order directing the treasurer to sell such property.

Rem. Rev. Stat. (Sup.), § 11294, provides, with reference to the sale of county tax-title property:

" . . . When the board of county commissioners desires to sell any property so acquired, *it* may, if deemed advantageous to the county, combine any or all of the several lots and tracts of land so to be sold in one or more units, and *it* shall then enter an order on its records fixing the unit or units in which the property shall be sold and the minimum price for each of such units, and directing the county treasurer to sell such property in the unit or units and at not less than the price or prices so fixed by said board: . . ." (Italics ours.)

Likewise, Rem. Rev. Stat., § 4072 [P. C. § 1665], provides:

"The *board* of county commissioners shall cause to be recorded, in a book to be kept for that purpose, all *their* proceedings and determinations touching all matters properly cognizable before *them*; and all books, accounts, vouchers, papers, and (accounts) touching the business or property of the county shall be carefully kept by the *clerk,* and open to the inspection of every person." (Italics ours.)

The criminal statute here involved is Rem. Rev. Stat., § 2585 [P. C. § 8861], which provides:

"Every person who, with intent to injure or defraud shall— . . .
" (2) Fail to make a true entry of any material matter in any public or private record or account; . . .
" . . . shall be guilty of forgery in the second degree, . . ."

It will be noted that Rem. Rev. Stat. (Sup.), § 11294, quoted above, makes it the duty of the *board,* as a body, and not of any *individual* member thereof, to *enter* the order required by the statute; and that Rem. Rev. Stat., § 4072, also above quoted, similarly

makes it the duty of the *board,* as a body, and not of any *individual* member thereof, to cause all their proceedings to be recorded in a book kept for that purpose.

Neither of those statutes confers the right, or enjoins the duty, upon any individual member of the board to do the things required therein. We are aware of no law which casts that responsibility upon any individual member of the board, and there is no proof in this case to support the charge in the information that the duty of entering such order rested upon appellant. Nor was there any evidence in the case of any conspiracy among the commissioners, or any two of them, to forego making or entering the required order. Further, there was no evidence that appellant in any way influenced either of his fellow commissioners to pervert or disobey the statute.

In short, there is nothing in the record to support a finding that the duty rested on appellant, as an individual, to enter the orders in question, or that the failure of the board to do its duty was the result of activity by appellant, with or without intent to injure or defraud. Whatever may have been appellant's personal intention with respect to the entire proceedings had by the commissioners, there is no basis for a verdict convicting him of failure to perform a statutory duty, since the duty in question did not rest upon him individually. In our opinion, Rem. Rev. Stat. (Sup.), § 11294, and Rem. Rev. Stat., § 4072, have no application to a situation such as is presented by the facts in this case.

■ Although the criminal statute here involved, Rem. Rev. Stat., § 2585, refers to "every person" who fails to make a true entry of any material matter in a public or private record, the application of that statute must necessarily be limited to those persons who

have the power, and upon whom rests the specific duty, to make such entry.

■ Conceding, however, for the sake of argument, that the sections of the statute above referred to *might*, according to the interpretation placed upon them by the trial court, be applicable to the instant situation, the result would simply be that a question of statutory construction would be presented concerning which judicial minds might radically, yet reasonably, differ. In such event, we are faced with the principle, universally recognized, that, in a criminal case, reasonable doubts upon questions of law, as well as upon questions of fact, must be resolved in favor of the accused. *State v. Anderson*, 61 Wash. 674, 112 Pac. 931; *State v. Furth*, 82 Wash. 665, 144 Pac. 907; 1 Wharton's Criminal Law 55, § 40.

For the reasons above given, we conclude that the challenge to the sufficiency of the proof as to counts seven and eight should have been sustained.

The judgment is reversed, with direction to dismiss counts seven and eight of the information, and to grant a new trial upon count one.

ROBINSON, C. J., MAIN, and DRIVER, JJ., concur.

BLAKE, J. (dissenting in part)—I think appellant is in no position to claim error because of misconduct of the trial judge. Although the trial lasted for seven days after the incident complained of, appellant took no exception to the rebuke or the remarks made by the court, nor did he ask for a mistrial at any time. He wagered on a favorable verdict. Failing to get it, he then, for the first time, claimed error. No error can be based on improper conduct of court or counsel where it is allowed to pass without some exception being taken to it in the form of a motion to admonish the jury to disregard it or for a mistrial. *State v. Re-*

*gan,* 8 Wash. 506, 36 Pac. 472; *State v. Bailey,* 31 Wash. 89, 71 Pac. 715; *State v. Van Waters,* 36 Wash. 358, 78 Pac. 897; *State v. Wong Tung Hee,* 41 Wash. 623, 84 Pac. 596; *State v. Smails,* 63 Wash. 172, 115 Pac. 82.

The case of *State v. Dalton,* 43 Wash. 278, 86 Pac. 590, presents a situation strikingly analogous to the situation here. There, it was held, upon a trial for murder, where an unwilling witness for the state refused to answer questions, that it was not error for the trial court to direct him to answer the questions, to look at the jury and to stop looking at the defendant, and then punish him for contempt in the presence of the jury.

I do not think appellant is entitled to a new trial on the first count of the information.

