[No. 36-40576-2. Division Two. January 15, 1970.]

THE STATE OF WASHINGTON, *Respondent,* v. WESLEY WHALON, *Appellant.*

McCormick, Hoffman, Rees & Arnold and Paul Hoffman, Jr., for appellant (appointed counsel for appeal).

Ronald L. Hendry, Prosecuting Attorney, J. D. Mladinov, Special Counsel, Eugene G. Olson, Chief Criminal Deputy, for respondent.

PEARSON, J.—The defendant, Wesley Whalon, Jr., is appealing from a judgment and sentence following a conviction for the crime of rape.

On October 13, 1967 at approximately 6:15 a.m. the prosecuting witness was raped. The crime took place in the bedroom of her home in South Tacoma in the presence of her 3-year-old son. The assailant threatened the victim

with a knife. The victim described her assailant to the police as a light-skinned Negro, about 5 feet 8 inches tall, and weighing around 140 pounds. She said he wore a light tan mask, which came halfway down over his face. The entire incident, according to the victim, lasted approximately 10 to 15 minutes.

On December 6, 1967 the defendant was seen behaving suspiciously in a parking lot in South Tacoma. He was wearing a light blue mask which covered his entire head. Whalon was apprehended after a chase. The mask, which the defendant dropped as he fled, was recovered by the police. When Whalon was searched, the police removed a piece of yellow paper with writing on it and an address book from the defendant's clothing. The piece of paper had handwritten on it nine steps for the commission of a rape in an automobile.[1]

The address book contained at the top of one page a name, address, and phone number in South Tacoma (not the victim's) and an arrow pointing from the words below —"rape her"—to the address. Another arrow pointed downward from the words "rape her" to "call tomorrow (Monday......".

The place where Whalon was arrested was within one block of his residence. It was within three blocks of the

---

[1]The note read (verbatim):
1. Pick isolated place.
2. Make sure there are no witnesses.
3. Knock victim unconscious.
4. Place here in rear of car, drive to some isolate place, a short distance from crime.
5. Tie her hands & feet, gag her, and place a pillow case over her head.
6. Make love to her.
7. Threaten her life, so she won't called the police.
8. Untie her, except for pillow case on her head.
9. Let get home as quick as possible.
Places for crime!
Washerteria
Safeway
(Drive there) ↓↦ away from home.

address in the address book. The location of Whalon's house was about five blocks from the scene of the rape.

After his arrest, the defendant was required to appear in a police lineup with four other Negroes. Whalon was of somewhat slighter build than the other participants in the lineup and his skin was of lighter color. Moreover, the other participants in the lineup wore street shoes, while Whalon wore slippers. The defendant's attorney was present at the lineup.

Each person in the lineup was required to repeat statements allegedly made by the assailant during the crime. The prosecuting witness was not able to identify the defendant as her assailant until she heard him speak. She stated that the basis for her identification was his voice, together with his physical appearance.

At the trial, the defendant insisted on testifying against the advice of his attorney. His testimony was in support of an alibi. Also, he offered explanations for his conduct on the night of his arrest, December 6, 1967, and for the exhibits found on his person. The defendant said he was planning to burglarize a store on that date to obtain needed money. Whalon said the writing in the address book was written down and shown to his wife to make her jealous. He said the notes on the piece of yellow paper constituted an outline for a short story he was planning to write.

There is no challenge to the sufficiency of the evidence to support the verdict. We will address the defendant's assignments of error in the order they were presented to us.

The first issue for our consideration involves the fairness of the lineup. The defendant has claimed that evidence of the lineup should not have been admitted because the lineup was unnecessarily suggestive and conducive to mistaken identification. There is no evidence that the defendant's attorney objected to the lineup at the time it was held, either as to the physical differences between the persons or the statements they were asked to recite. . . .

█ The United States Supreme Court in *United States v. Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926

(1967) holds that there is no violation of an accused's constitutional rights in requiring him to speak within hearing distance of the witnesses, even to utter the words purportedly uttered by the criminal, so long as his counsel is present to insure an objective lineup and to enable the defense attorney to reconstruct at the trial any unfairness that might have occurred. In *Wade,* as here, the voice identification was combined with observations of physical characteristics other than voice, and identification was not solely limited to the victim's recognition of defendant's voice.

█ It is a general rule that voice identification is sufficient identification to sustain a conviction where the witness has some reasonable basis for comparison of the accused's voice with the voice which is identified as the accused's. The probative value of such evidence is a question for the jury. See *Small v. State,* 165 Neb. 381, 85 N.W.2d 712, 70 A.L.R.2d 984 (1957). *Also see* 70 A.L.R.2d 995 for a collection of cases concerned with the identification of an accused by his voice.

In our opinion, the victim's exposure to her assailant and hearing him speak before, during, and after the crime, together with her identification of his physical characteristics are sufficient bases on which to sustain her identification. See *Biggers v. Tennessee,* 390 U.S. 404, 19 L. Ed. 2d 1267, 88 S. Ct. 979 (1968), where the United States Supreme Court upheld a conviction for rape and the only evidence connecting the accused with the rape was the testimony of the complaining witness that she had identified him by his size, his voice, his smooth skin, and his bushy hair.

However, defendant claims that the totality of circumstances surrounding the lineup made it unfair. He claims that physical differences distinguishing the defendant from the other participants in the lineup and the outrage inevitably aroused in the victim when she heard the words uttered by her assailant, created a highly suggestive situation which could easily lead to mistaken identification.

█ We are aware that a lineup, particularly in a rape

case, presents a particular hazard that a victim's understandable outrage will excite vengeful motives. *United States v. Wade, supra.* This is the very reason for having defendant's counsel present, as was done in this case. Defendant's counsel vigorously attacked the victim's identification on cross-examination. His efforts were directed toward weakening the identification of the defendant with the crime. He exposed the lineup and the procedures used there to the scrutiny of the jury. He also examined the police officers who administered the lineup. The jury was made fully aware of what happened, and could give the lineup identification its proper weight.

Similar considerations are present here as were in the *Wade* case and two companion cases, *Gilbert v. California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951 (1967) and *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967). However, we, like the United States Supreme Court in *Wade,* are cognizant that eye witness identifications may sometimes be unreliable. Police officials should make every effort to present as many persons as is practically possible with similar physical characteristics in a lineup. We believe that was done in this case and the differences in physical characteristics were effectively brought to the jury's attention by cross-examination. We do not find reversible error in the lineup.

The second assignment of error concerns the admission of evidence concerning the events of December 6, 1967, and the admission into evidence of the mask (exhibit 2), the address book (exhibit 1), and the yellow paper with notes on it (exhibit 7). This assignment of error, like the first one, concerns the central issue in the case at trial—identity of Whalon as the assailant. The defendant has not made any complaint, either at trial or on appeal, concerning the seizure of the items in question. Consequently, we shall assume that the only issue concerning the admission of the items is their relevancy.

The defendant has claimed that the testimony of the arrest and the items seized on December 6 are totally irrel-

evant to the crime of rape charged. Defendant contends the evidence was of a separate and independent crime, that it was highly inflammatory in nature, and should therefore have been excluded.

A trial court has discretion concerning the admissibility of evidence insofar as its relevance is concerned. The standard for relevancy is whether the evidence gives rise to reasonable inferences regarding contested matter or throws any light upon it. *State v. Schock,* 41 Wn.2d 572, 250 P.2d 516 (1952). Relevancy means a logical relation between evidence and the fact to be established. *Chase v. Beard,* 55 Wn.2d 58, 346 P.2d 315 (1959). Any evidence which tends to identify the accused as the guilty person is relevant. *State v. Spadoni,* 137 Wash. 684, 243 P. 854 (1926).

Any competent evidence which tends logically to prove a defendant's connection with a crime is material. Materiality is judged not only upon what the evidence shows standing alone, but also on whatever inferences may be drawn when it is viewed in connection with other evidence. Relevant and material evidence is admissible. Its cogency and the degree to which it elucidates facts in issue become matters of the weight given the evidence by the jury. *State v. Gersvold,* 66 Wn.2d 900, 406 P.2d 318 (1965).

The general rule stated in *State v. Goebel,* 40 Wn.2d 18, 21, 240 P.2d 251 (1952) is that a defendant must be tried for the offenses charged in his indictment or information, and evidence of unrelated crimes may not be admitted unless certain exceptions exist:

> These exceptions are to show (1) motive, (2) intent, (3) the absence of accident or mistake, (4) a common scheme or plan, or (5) identity. This list of exceptions is not necessarily exclusive, the true test being whether the evidence as to other offenses is relevant and necessary to prove an essential ingredient of the crime charged. *State v. Lew,* 26 Wn. (2d) 394, 174 P. (2d) 291 [1946].

*Also see* the first appeal of *State v. Goebel,* 36 Wn.2d 367, 218 P.2d 300 (1950), where the same case had previously been before the Supreme Court.

In *State v. Goebel*, 40 Wn.2d 18, 240 P.2d 251 (1952) it was held that evidence that defendant had confessed to the commission of a rape on March 29, 1949 was relevant to establish his *identity* as the perpetrator of another rape committed later the same day, as well as to establish his identity as the perpetrator of an earlier rape committed on February 8, 1949.

Subsequent to *State v. Goebel*, 40 Wn.2d 18, 240 P.2d 251 (1952), the Supreme Court has analyzed the admission of related criminal activity on the basis of whether or not it fell within one of these exceptions (*see State v. Hames*, 74 Wn.2d 721, 446 P.2d 344 (1968)), and if so, whether or not its probative value was outweighed by its highly prejudicial effect. *See State v. McClung*, 66 Wn.2d 654, 404 P.2d 460 (1965).

In *Hames* at 723 there is a summary of the cases dealing with application of the exceptions and an excellent analysis of the traditional approach in applying the exceptions to subsequent conduct which "probably falls short of establishing other crimes." (At 722.)

As pointed out in *Hames*, the relevance and materiality of this type of evidence does, as in any case, depend upon the issues that are being tried. Where, as here, identity is the only essential ingredient of the state's case, we must analyze the relevancy and materiality of the three exhibits with reference to whether or not each tended to identify him as the likely perpetrator of the crime.

We, like the court in *State v. Goebel*, 40 Wn.2d 18, 240 P.2d 251 (1952), fail to see how Whalon's possession of the three exhibits on December 6, 1967 would show a "design or plan" to commit the forcible rape on October 13, 1967. Application of a "common scheme or plan" retroactively is fraught with speculation, unless the subsequent criminal conduct is so similar and peculiar in nature as to show a modus operandi (*see Coney v. State*, 193 So.2d 57 (Fla. 1966)), or unless the subsequent criminal conduct is a continuation of the earlier crime with which defendant was accused. *See State v. Johnson*, 60 Wn.2d 21, 371 P.2d 611

(1962), where defendant was charged with the crime of taking indecent liberties with a 13-year-old female in Snohomish County on July 22, 1959. Over objection, the prosecuting witness was permitted to testify that she had sexual intercourse with the defendant in another county later the same night, for which offense the defendant was not charged. In upholding the admission of this evidence, the court states at 26:

> The testimony of the prosecuting witness, to which defendant now objects, is relevant, for it tends to establish a common scheme or plan. Being a continuation of the crime charged, we cannot say that the "minute peg of relevancy will be entirely obscured by the dirty linen hung upon it."

We deem neither the *Coney* nor *Johnson* rationale applicable here. However, any of the exceptions, whether it be to show motive, intent, absence of mistake, or common plan or scheme, has as its primary purpose to corroborate the identity of the defendant as the person who likely did commit or likely intended to commit the offense charged.

In the case at bar, the address book (exhibit 1), and the mask (exhibit 2), when placed in context with the other evidence in the case, appear to us relevant to identify Whalon as a likely perpetrator of the crime with which he was charged. The place of Whalon's arrest under suspicious circumstances was within a short distance of his home. It was also a few blocks from the address in the address book and within a few blocks from the home of the prosecuting witness. Admission of these exhibits tends to corroborate the identification made of Whalon by the victim.

The discourse on how to commit a rape in an automobile seems pertinent to show that the defendant, at least 7 weeks after the crime, had a lustful disposition and sometimes thought about rape. Whalon offered explanations for his behavior on the night of his arrest and for the documents he was carrying, but he did not attempt to explain why he was carrying the documents with him while he was attempting a burglary.

■ As we have pointed out, there is relevancy in all the evidence to which objection was raised. All three exhibits are inflammatory, and we must determine whether their remoteness from the time of the crime affects their probative value to the extent that they should have been excluded from evidence. All three of the exhibits undoubtedly aroused the sensibilities of the jury. The specific issue involved here was whether the tendency of these exhibits to identify the defendant as *the* assailant in corroboration of the complaining witness' identification, is outweighed by their highly prejudicial effect. *See State v. Goebel,* 36 Wn.2d 367, 218 P.2d 300 (1950), *McClung; State v. Weaver,* 60 Wn.2d 87, 371 P.2d 1006 (1962). We consider this a close question that fell within the discretion of the trial court. We cannot say that this discretion was abused by admission of the mask and the address book. However, we believe the yellow paper, containing the nine steps to commit a rape, was inflammatory far beyond its probative value and should not have been admitted. Evidence showing lustful disposition should only be admitted in a sex offense case where it tends to show such lustful inclination toward the offended female. *State v. Thorne,* 43 Wn.2d 47, 260 P.2d 331 (1953).

"When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out." *Shepard v. United States,* 290 U.S. 96, 78 L. Ed. 196, 54 S. Ct. 22 (1933).

■ When this case is retried and the mask and address book are offered in evidence, we believe that the requirements of *State v. Goebel,* 36 Wn.2d 367, 218 P.2d 300 (1950) should be strictly followed by the trial court and that at the time these documents are admitted the limited purpose for the admission should be enunciated by the trial court to the jury. *State v. Goebel,* 36 Wn.2d 367, 218 P.2d 300 (1950) states at 378:

It is our view that this matter of the admission of evidence of independent and unrelated crimes, placing a defendant, as it virtually does, on trial for offenses with

which he is not charged, and which may well be better calculated to inflame the passions of the jurors than to persuade their judgment, should be surrounded with definite safeguards. When it becomes apparent that certain evidence tends to prove an independent and unrelated offense, the trial judge, in the absence of the jury, should ascertain upon what basis of relevancy the state relies. If the evidence offered is shown to be relevant to any material issue before the jury, it *may* be admitted, and, if it is, an explanation should be made at the time to the jury of the purpose for which it is admitted. (The reason for its admission will generally be found within the five generally recognized exceptions to the rule of exclusion, but we are not prepared to say that they are exclusive.) The court, in arriving at its decision as to the admissibility of the evidence, is of course not limited to the reasons given by the state; but the court should state to the jury whatever it determines is the purpose (or purposes) for which the evidence is admissible; and it should also be the court's duty to give the cautionary instruction that such evidence is to be considered for no other purpose or purposes.

Such procedure was not followed in this case. When the objection was made to the admission of these exhibits, the trial court overruled the objection and the jury was never told the specific purpose for which it was allowed. Instead, in its instruction 7-A, the court permitted the jury to consider the exhibits upon the question of the defendant's "motive, intent, absence of accident or mistake, common scheme or plan or identity."

In our opinion, the court should have cautioned the jury to consider this evidence only insofar as it tended to identify the defendant as the assailant, if at all, since identity was the only issue in the case.

We think on retrial the purpose for the admission of the exhibits should be told to the jury at the time they are offered, if a proper request for such explanation is made by the defendant.[2]

It was also error for the court in instruction 14 to

---

[2] No such request was made at the trial.

inform the jury that defendant's flight from the scene of the crime was a circumstance to be considered in establishing his guilt. There was no testimony that Whalon fled from the scene of the rape and the only context in which that instruction could have been used by the jury related to his flight on December 6, 1967. As stated in *State v. Bruton*, 66 Wn.2d 111, 401 P.2d 340 (1965), the circumstances or inference of flight must be substantial and real, rather than speculative or conjectural. The flight of Whalon on December 6, 1967 and his subsequent arrest for loitering were admissible as a foundation for introduction of the mask and the address book. However, it would be speculative to permit the jury to infer guilt for the offense charged from a flight from the scene of a potential crime occurring 7 weeks later. This instruction should not be given when the case is retried.[3]

During the course of the trial, an exchange took place between defense counsel and the trial judge. The trial court strongly rebuked the attorney in the presence of the jury. We quote from the transcript.

By MR. HAYES: [Deputy Prosecuting Attorney]

Q Mrs. . . . , will you tell the Jury why you didn't want to talk to Mr. Fountain [Defendant's Attorney] about this?

A I didn't feel it was necessary. That if he had any questions, he could ask them right here in court.

Q Why didn't you want to talk to him?

A I really didn't want to speak to him about it.

Q Did you want to come in here and testify?

A I wouldn't be here from Anchorage, Alaska, if I wasn't; unless I was made to come. And my three-year-old son, every time he picks up a knife still remembers it.

Q Do you think you will ever forget what happened that morning?

A I don't think I will. I hope—really hope that [the boy] does.

---

[3]Error was not assigned on appeal to the giving of this instruction, although proper and vigorous exception was taken at the trial. We inject this suggestion to obviate a potential future ground for appeal.

MR. HAYES: I have no further questions. Thank you, Mrs. . . .

THE COURT: Any further questions, Mr. Fountain?

MR. FOUNTAIN: Mrs. . . . , I sympathize with you. I realize you have been through a bad . . .

THE COURT: *Mr. Fountain, that is highly improper.*

MR. FOUNTAIN: Sorry, your Honor.

THE COURT: *It's pre-determined by Counsel. I will not allow that in this court.*

MR. FOUNTAIN: I'm sorry, your Honor, I didn't understand you.

THE COURT: *I say, it was pre-determined on Counsel's part.*

MR. FOUNTAIN: I don't think so, your Honor.

THE COURT: *Well, I do; it's highly improper.*

All right, you can step down, Mrs. . . . You are not excused to go back to Alaska until I excuse you, Mrs. . . . , and you have signed the witness book.

MR. FOUNTAIN: If your Honor pleases . . .

THE COURT: *Mr. Fountain, you will remain silent at this time and I will excuse the Jury.*

THE COURT: Let the record show the Jury is out of the court room and the door is closed. Mr. Fountain, I will hear from you.

MR. FOUNTAIN: Your Honor, I move for a mistrial.

THE COURT: Your motion is noted and overruled.

MR. FOUNTAIN: Exception.

THE COURT: Exception is noted.

MR. FOUNTAIN: I move for a mistrial on the grounds that the Court has derogated the integrity of Counsel and Mr. Whalon cannot receive a fair trial after this.

THE COURT: Mr. Fountain, the Court stated before the Jury what I said because of the obvious play on the Jury's sympathy; and I did it, having in mind that Counsel deliberately chose to interject this note in there to get some sort of sympathy for he and his client. In my opinion that risk Counsel took by making that statement is a reprimand from the Court and that is exactly what I gave you. Court rooms are no place for sympathy and it's no place for counsel to try and play on the sympathy of the jury. Mr. Fountain, I'm not through. You have made your objection for the record, and there it is. In my opinion, it's highly questionable tactics, and I will have no more of that

during this trial. The Court is armed with contempt powers which I will exercise to the fullest. I believe I have made myself clear on it. Your objection has been noted and we will take a fifteen minute recess.

(Italics ours.)

The defendant claims that the rebuke to the defense attorney effectively impaired the usefulness of counsel, thereby depriving the defendant of a fair trial. We agree.

■ It is well settled law that a trial judge has wide discretion in rebuking an attorney who oversteps the bounds of proper courtroom behavior. The rule in Washington concerning remarks to counsel by a judge is set forth in *State v. Levy*, 8 Wn.2d 630, 113 P.2d 306 (1941). There, the Supreme Court said that a merited rebuke to the defense counsel in the presence of the jury is presumed not to be reversible error, unless prejudice is shown to have occurred to the defendant. Prejudice may be presumed to have occurred to the defendant if the court's remark can be said to have been reasonably calculated to have a prejudicial effect.

The rebuke to the defendant's lawyer in this case was a serious overreaction to what appears to be a sympathetic statement of defense counsel. Immediately before Mr. Fountain's statement, the prosecutor asked a question designed to elicit sympathy for the victim and to arouse rage against the assailant. The trial court allowed the prosecution's action to go unnoticed, but rebuked defense counsel for his remark which was prompted by the prosecutor's prior line of questioning. The court's rebuke would appear to indicate tendencies in favor of the prosecution.

A more serious effect of the rebuke was the reflection it cast on the integrity of the defense attorney. The court said in effect that Mr. Fountain had planned his statement in an attempt to help his position with the jury. The comment amounted to an accusation that Mr. Fountain was guilty of unethical conduct. *State v. Levy, supra,* and *State v. Phillips,* 59 Wash. 252, 109 P. 1047 (1910). We are not in a position to dispute the judge's opinion on counsel's prede-

termination. However, from the record, it seems probable that the attorney was without fault.

The rebuke occurred as the defense began recross-examination of the prosecuting witness. It was a tense moment during the trial. Emotions were inevitably aroused by the questions of the prosecution and the responses of the witness. The effect of the rebuke on counsel can be shown by the fact that the defendant's attorney did not exercise his right to recross-examine the prosecutrix. However, defense counsel did continue to defend his client and voice his objections. *See United States v. Golden,* 355 F.2d 453 (7th Cir. 1965).

The Supreme Court has tended to support the actions of the trial court in rebuking an attorney before the jury when an attorney goes beyond the scope of proper behavior. *State v. Collins,* 66 Wn.2d 71, 400 P.2d 793 (1965). The severity of the rebuke is generally within the discretion of the court. *State v. Lyskoski,* 47 Wn.2d 102, 287 P.2d 114 (1955), and 62 A.L.R.2d 166 (1958) at 226. The Supreme Court has upheld severe rebukes by the doctrine of invited error, *Collins,* 66 Wn.2d at 75; or by holding that the remark was addressed to the attorney and not to the jury. *State v. Boyd,* 150 Wash. 326, 332, 272 P. 964 (1928).

On the other hand, there are limits to the remarks a judge may make in rebuking an attorney. *State v. Herwitz,* 109 Wash. 153, 155, 186 P. 290 (1919); *Levy,* 8 Wn.2d at 643; *Boyd,* and *State v. White,* 10 Wash. 611, 614, 39 P. 160, 41 P. 442 (1895). The judge's comment must not reflect on the integrity of counsel. Such a reflection destroys the effectiveness of counsel in the eyes of the jury, and deprives the defendant of representation. The court in this case twice stated that Mr. Fountain was making a knowing effort to inject improper matters into the trial. We think that the court's rebuke was reasonably calculated to have a prejudicial effect against counsel and the defendant.

There is no question that the content of Mr. Fountain's remark was improper and that a rebuke was merited, unless such remark is placed in context with the play on

sympathy by the prosecuting attorney. After examining the situation at the trial when the rebuke was made, we think "all that was necessary or proper in the presence of the jury was a quiet word of admonition, [to both counsel] and the case would have proceeded as before." *State v. White, supra* at 614. The exchange between court and counsel, if it took place at all, should have taken place outside the presence of the jury. *See State v. Levy,* 8 Wn.2d 630, 113 P.2d 306 (1941).

We note that the court did not attempt to give a corrective instruction to the jury. Such an instruction would be to the effect that the incident should be disregarded in deciding upon the guilt or innocence of the accused. we think such an instruction should have been given.

The rebuke of counsel constituted reversible error.

After Whalon testified in his own behalf, the defense sought to call the defendant's wife as a witness. Mrs. Whalon's name was not on the witness list because the defense had not intended to call her as a witness. The need for her testimony arose to corroborate Whalon's unexpected alibi testimony. The state objected to the testimony of the wife on the grounds that she had remained in the courtroom at her husband's side after all witnesses had been excluded. The trial court upheld the state's objection and refused to allow Mrs. Whalon to testify. The state did not claim prejudicial surprise when defendant's wife sought to testify.

The defendant claims that the refusal to permit Mrs. Whalon to testify was reversible error.

Our Supreme Court in *Castleman v. Schiffner,* 160 Wash. 313, 294 P. 983 (1931), said at 318:

It has been stated as a general rule, in substance, that the matter of receiving the testimony of a witness who has violated an exclusion rule is within the discretion of the trial court. This general statement, however, we think, must be applied with great caution when the enforcement of an exclusion rule has the effect of excluding material testimony. When the testimony is admitted by the trial court, there is usually but little room for ever saying there is an abuse of discretion on the part of the

trial court; but when the strict enforcement of an exclusion rule has the effect of excluding material evidence, such a ruling of a trial court, we think, is subject to critical inquiry by the appellate court.

■ In a recent case, *State v. Johnson*, 77 W.D.2d 429, 462 P.2d 933 (1969), the Supreme Court said at 434:

If, through inadvertence, inattention or mistake an excluded witness remains in the courtroom under circumstances which show the witness and the party who calls him are innocent of intention to violate the court's order, it is generally held an abuse of discretion to deprive a party without fault of substantive evidence.

In that case it was held not an abuse of discretion to refuse the testimony of defendant's wife, who remained with him during the trial, where the court had specifically told defendant that if she did remain she would not be allowed to give substantive alibi evidence.

The testimony of Whalon's wife was material and should have been permitted. The jury, knowing that she had heard her husband's testimony, could give Mrs. Whalon's testimony whatever weight it deserved as corroboration. *See* 14 A.L.R.3d 16 (1967) at 111-114.

The trial court had expressly permitted Mrs. Whalon to sit at the counsel table during the trial. There is no indication that the wife stayed in the courtroom in order to gain any advantage for herself. There is no indication that defense counsel knowingly or intentionally kept her in the courtroom to gain any advantage. It is apparent from the record that Mrs. Whalon was allowed to remain in the courtroom due to mere inadvertence, and that her husband unexpectedly decided to testify, against the advice of his counsel.

Unlike the *Johnson* case, the defendant was not given the choice of whether or not his wife should remain, in the face of the court's ruling.

We believe that it was an abuse of discretion by the trial court to refuse to permit defendant's wife to testify when

there is no indication that she or her husband's attorney were at fault.

Before the jury retired for final deliberations, the court told the jury that they could have the tape recording which was made at the lineup played for them during deliberations. The court told them to notify the bailiff and "we will have someone play it for you as quickly as possible." The defense did not offer any objection to the jury's hearing the tape. After they retired, the jury asked the bailiff to let them hear the recording. After 20 minutes of preparation, the bailiff conducted the jury into the courtroom, where two police officers without uniforms played the tape for the jury. There was a request to have the tape replayed, and it was played a second time. After that, the jury was again locked up. The incident occurred in the absence of court and counsel.

The court learned of the incident after it had occurred. After the jury had returned their verdict, the court and attorneys questioned the jury and the three bailiffs about the occurrence. The jury members said that the only communication between them and the other persons involved were the requests to have the tape played. The three bailiffs who were present agreed on all points with the jury's statement of the incident.

The defendant claims that the mere occurrence of the incident involving the playing of the tape by police officers was prejudicial. The situation involved such a potential hazard to the objectivity of the jury that a reversal is warranted on this issue, defendant says. We disagree.

RCW 4.44.300 prevents a bailiff from communicating with a jury, unless by order of the court, except to ask them if they have agreed upon a verdict. RCW 4.44.320 provides that if the jury requires additional instructions, then such instructions must be given in open court after notice to both attorneys.

Courts have zealously protected the jury from outside influences and prejudicial communication. *O'Brien v. Seattle*, 52 Wn.2d 543, 327 P.2d 433 (1958); *State v. Moore*, 38

Wn.2d 118, 228 P.2d 137 (1951). However, the Supreme Court has allowed a verdict to stand when no prejudicial effect is shown from communication between jurors and their custodian. *State v. Smith*, 43 Wn.2d 307, 261 P.2d 109 (1953), and cases there cited.

In the case at bar, the trial court made a prompt inquiry into the circumstances surrounding the playing of the tape. There is no indication whatsoever in the responses to the questions put to the jury and the three bailiffs by court and counsel that defendant was prejudiced. No verbal communication passed, outside the requests to hear the tape. The bailiff apparently assumed that he was acting under authority of the judge when he supervised the playing of the recording.

The tape recording had been heard by the jury during the trial. The challenged incident involved simply a review by the jury of the recording they heard during the trial. There is no harm in a jury's reviewing a recording during deliberations. *Sears v. United States*, 343 F.2d 139 (5th Cir. 1965); *Cranfill v. State*, 155 Tex. Crim. 351, 235 S.W.2d 146 (1950). However, it might have been error to allow the jury to play and replay the tape on their own. *State v. Slater*, 36 Wn.2d 357, 218 P.2d 329 (1950).

The defense raised no objection to the playing of the tape, either at the time it first learned of the incident, or in its motion for a new trial. In *State v. Hulet*, 159 Wash. 72, 292 P. 107 (1930), the Supreme Court reviewed an assignment of error dealing with an occurrence where a juror had lunch with a witness during the trial. The court said that having made no motion for a mistrial when the matter first became known, the appellant there could not take advantage of the incident without a showing of a probability of prejudice to him. Defendant here has not shown a probability of prejudicial communication during the incident. However, on retrial the court should be present when such an event takes place and counsel likewise should be advised of the jury's request. This is particularly

804

true where some one other than the bailiff is present to operate the replay.

 Even though we do not think there was reversible error in the playing of the tape, this occurrence along with the rebuke to counsel and the refusal of testimony of defendant's wife, are breaches of desirable trial procedure. When considered together, the three events have the cumulative effect of depriving the defendant of a fair trial. *State v. Simmons,* 59 Wn.2d 381, 368 P.2d 378 (1962). Consequently, we believe that defendant should have a new trial under the cumulative error rule, as well as for the other grounds stated herein.

Accordingly, the judgment and sentence are reversed and the defendant is granted a new trial.

ARMSTRONG, C. J., and PETRIE, J., concur.