IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 29033-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CLAYTON GENE STAFFORD, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — A jury convicted Clayton Gene Stafford of aggravated

first degree murder. On appeal, he contends (1) the trial court erred in not suppressing his

statements made during police interrogation because he did not waive his right to have an

attorney present, (2) the Sixth Amendment confrontation clause was violated when the

court allowed DNA[1] expert testimony from a witness who was not the person who tested

the evidence, (3) the court abused its discretion in allowing irrelevant and unfairly

prejudicial testimony of a witness, (4) the State failed to prove the essential elements of

aggravated first degree murder, and (5) the jury was erroneously instructed that it had to

---

[1] Deoxyribonucleic acid.

be unanimous to answer "no" to the special verdict. We disagree with his contentions and affirm.

## FACTS

On June 12, 1993, Shawna Yandell and her boyfriend, Travis Sinden, went to Sportsman's Park by the Yakima River. While they were there, Mr. Sinden passed out in the public restroom after drinking too much. Ms. Yandell awakened Mr. Sinden because she was cold, tired, and wanted to go home. Around midnight, the couple tried to get a ride from the park ranger, but the ranger refused. The couple was staying with Mr. Sinden's relatives, the Wilkeys, and Mr. Sinden called them for a ride. Members of the Wilkey family told Mr. Sinden that they would not pick him up, primarily because of the late hour.

Unable to secure a ride, Mr. Sinden went back into the restroom and fell asleep. He awoke while it still was dark. Ms. Yandell was gone. He yelled for her but could not find her. He began walking back to the Wilkeys, thinking that Ms. Yandell may have done the same.

Ms. Yandell was not at the Wilkeys. Mr. Sinden was worried and went back to the park to search for her. He did not find her, so he went back to the Wilkeys' house and waited. Eventually, Mr. Sinden called the police and reported her missing.

Meanwhile, a group of Boy Scouts on a canoe trip found Ms. Yandell's body in the Yakima River. The location was about two and one-half miles upstream from Sportsman's Park. Ms. Yandell's body was nude, except for a black bra pushed up over her shoulders. Officers responded and observed that Ms. Yandell's scalp was open. A search was conducted of the area but no additional evidence was found.

Dr. Norman Thiersch, a medical pathologist, conducted an autopsy the following day and determined that the cause of Ms. Yandell's death was a blow to her head by a blunt object. There were also signs of strangulation. Dr. Thiersch swabbed Ms. Yandell's mouth, anus, and vagina. Dr. Thiersch found spermatozoa on the vaginal swabs.

Ms. Yandell's homicide remained unresolved for over 15 years. In 2008, the Yakima police had the swabs further tested. Spermatozoa were found on both the vaginal swab and the oral swab. A DNA analysis of the spermatozoa was completed and the results were entered into CODIS.[2] On May 20, 2009, a match was discovered between the DNA found on Ms. Yandell's body and a DNA profile in CODIS. Further testing confirmed that the DNA matched Mr. Stafford.

---

[2] Combined DNA Index System.

3

Yakima County officers went to Mr. Stafford's home in Yakima, handcuffed him, took him to police headquarters, and interrogated him. Yakima County charged Mr. Stafford with Ms. Yandell's homicide on May 26, 2009. Later, and by amended information, the State charged Mr. Stafford with aggravated first degree murder and first degree rape of Ms. Yandell.

Prior to trial, Mr. Stafford moved to suppress his statements made during the interrogation, claiming that officers ignored his request for counsel. A CrR 3.5 hearing was held to determine the admissibility of Mr. Stafford's statements. The recording of the interrogation was played at the hearing. The first mention of the right to counsel came at the very beginning of the interview. Yakima Police Lieutenant Noland Wentz handed Mr. Stafford a list of rights and asked him to follow along. In going over the list, Lieutenant Wentz asked, "Do you understand that this statement is being recorded?" Report of Proceedings (RP) at 43. Mr. Stafford responded, "Yes, I (inaudible) hear that. And I understand that I should have an attorney present most, pretty soon." RP at 43. Lieutenant Wentz replied, "Okay. Well, let me go through this." RP at 43.

After a few biographical questions, Lieutenant Wentz then went over Mr. Stafford's constitutional rights. He asked that Mr. Stafford write his initials by each right as they were addressed. Lieutenant Wentz informed Mr. Stafford that he had the right to

4

an attorney before answering any questions and also during questioning. Mr. Stafford

said he understood the rights as explained by Lieutenant Wentz. Lieutenant Wentz asked

Mr. Stafford if he wished to talk. Mr. Stafford responded that he wanted to know what

was going on. Lieutenant Wentz further explained the right to counsel.

> [Lieutenant Wentz:] And I haven't filled you in entirely yet, so.
> Do you understand that you may re-claim any of these rights at any
> time during this statement, including the right to stop questioning altogether
> and the right to the presence of an attorney?
> [Mr. Stafford:] Yes
> [Lieutenant Wentz:] What does that mean to you?
> [Mr. Stafford:] That means that if I want, you guys will go get an
> attorney before we go any further than we are right at this moment.
> [Lieutenant Wentz:] And it means that if we decide—if you decide
> to talk to me at some time and you decide at some point that—while you're
> talking to me, that you want to change that and ask for an attorney, we stop.
> [Mr. Stafford:] Yeah, that's what I just said.

RP at 45-46. Mr. Stafford signed an explanation of rights.

Next, Lieutenant Wentz gave Mr. Stafford a waiver of constitutional rights.

Lieutenant Wentz explained,

> [Lieutenant Wentz:] Well, this is a (inaudible) waiver of
> constitutional rights. This is if you're willing to talk with me to begin with.
> [Mr. Stafford:] Yeah, I'm not going to sign none of that unless an
> attorney asks me to sign something like that.
> [Lieutenant Wentz:] Okay. Well, I'm not an attorney.
> [Mr. Stafford:] Right.
> [Lieutenant Wentz:] And I told you before that I can't advise you.
> [Mr. Stafford:] Right.

> [Lieutenant Wentz:] All right. What I'm going to do is kind of tell you a little story.
>
> [Mr. Stafford:] Okay, tell me a little story.

RP at 46-47.

Lieutenant Wentz told Mr. Stafford of how the body of Ms. Yandell was found in the river and asked Mr. Stafford about his connection to the Yakima area. Mr. Stafford responded to Lieutenant Wentz's questions. He denied knowing Ms. Yandell or Mr. Sinden. Lieutenant Wentz then told Mr. Stafford that he was a person of interest in the case. Mr. Stafford denied any knowledge of involvement in the matter. Lieutenant Wentz also told Mr. Stafford that Ms. Yandell was sexually assaulted before she was murdered and that Mr. Stafford's DNA was found. Mr. Stafford disagreed. After more questions, Mr. Stafford requested an attorney, saying, "I need an attorney, you know? I mean, you guys are—it looks like you're serious about this shit, so I guess it's time for me to get serious about it." RP at 65.

Mr. Stafford argued to the trial court that all of his statements should be suppressed because he was denied the right to counsel. He contended that he invoked the right to counsel during the advisement of rights. He testified that he asked for an attorney

three or four times and assumed that an attorney was on the way. He admitted to having prior experience with reading rights and was familiar with *Miranda*[3] warnings.

The trial court found that Mr. Stafford did not unequivocally request an attorney until the officers stopped the interview. The court explained that Mr. Stafford's refusal to sign the waiver was not an unequivocal assertion of his right to an attorney. The State offered at trial, and the court admitted Mr. Strafford's statements made prior to the request for counsel.

At trial, Dr. Roger Vielbig testified that he was with the group of Boy Scouts when Ms. Yandell's body was found. He said that Ms. Yandell had blood on her face and bruises on her knees. Regarding the location, he testified that the portion of the river where Ms. Yandell's body was found had deep channels and a swift current. He noted that entering the river in that location was dangerous. A person could be towed under and suffer bumps, bruises, and scratches from the logs and rocks in the river.

Mr. Sinden also testified. He recounted the events of the evening, including passing out in the park and walking to the Wilkeys without Ms. Yandell. He also testified that he and Ms. Yandell came to Yakima about three weeks prior to the incident and were looking for work picking cherries. Mr. Sinden said that he and Ms. Yandell were always

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

together and never did anything apart. Mr. Sinden also said that he did not know Mr. Stafford.

Theresa LaFray was called to testify for the State. A week prior to being called to testify, Ms. LaFray came forward with new information. Mr. Stafford objected, and argued that her testimony was more prejudicial than probative, was uncorroborated, was inconsistent with information she provided in prior interviews, and was disclosed untimely. The trial court conducted a hearing outside the presence of the jury to hear argument and consider Mr. Stafford's objections. The court overruled Mr. Stafford's objections, and noted that the objections provided good fodder for cross-examination.

The new information consisted of the following: Ms. LaFray testified that one night during the middle of the summer in 1993, Mr. Stafford showed up at her house covered in blood. At the time, Mr. Stafford lived next door with his sister. Ms. LaFray estimated that her home was about three-quarters of a mile from Sportsman's Park. Mr. Stafford told Ms. LaFray that he was in a fight with some Mexicans and wanted to know how to get blood out of his clothes. Ms. LaFray told Mr. Stafford, "[D]on't say another word. I want you to get in the shower and throw your clothes out to me and I will wash them for you, and I will tell you when they are washed and dried. And then leave." RP at 1454. According to Ms. LaFray, Mr. Stafford had no injuries but had blood on his jeans,

8

t-shirt, over-shirt or light jacket, and the top of his underwear band. After Ms. LaFray returned Mr. Stafford's clothes, he left as directed.

Ms. LaFray admitted that she did not come forward with this information until the middle of trial. She came forward because she thought there was a chance that Mr. Stafford would not be convicted and felt like she needed to come forward even though she was scared. She also said that she had been stressed over the matter and felt that she needed to report it. She admitted that she did not like Mr. Stafford.

Dr. Thiersch testified to Ms. Yandell's autopsy results. Dr. Thiersch attributed Ms. Yandell's death to a blunt impact to the head with bruising of the brain. Ms. Yandell's scalp was lacerated on the front of her head and her skull was fractured. On the back of her head, there were four more lacerations with skull fractures. Dr. Thiersch testified that the skull fractures were significant, lethal injuries causing damage to the brain, and that these injuries were consistent with being hit with an object. He said that floating down the river would not have caused the lethal injuries.

He also noted evidence of strangulation on her body. Ms. Yandell had bruising on her chin and along the side of her face and hemorrhages in the structure of her neck. Dr. Thiersch concluded that the head injuries and strangulation appeared to have occurred about the same time.

9

Dr. Thiersch found evidence of defensive wounds on Ms. Yandell's arms, legs, and feet. In addition, Dr. Thiersch saw injuries with a linear pattern on Ms. Yandell's left thigh, right hip, lower abdomen, and the back of her left leg. He testified that these could have been caused by someone dragging her or possibly by bumping on rocks and branches when floating down the stream. He also testified that the bruises were purple or red, which was indicative of being caused while still alive. Dr. Thiersch estimated that Ms. Yandell's body was in the water for at least a couple of hours, perhaps longer.

Dr. Thiersch testified that he found spermatozoa on the vaginal swabs taken from Ms. Yandell. He said that the spermatozoa could have been up to seven days old when they were found, depending on temperature and other conditions. However, he said spermatozoa typically last only 24 to 30 hours. Dr. Thiersch further testified that he was unable to tell whether Ms. Yandell was raped or had consensual sex. He was also unable to tell whether the person Ms. Yandell had sex with was the same person who inflicted the lethal head injuries.

The State called Valencia Ward, a DNA analyst for Orchid Cellmark, to testify about the 2008 DNA testing of the vaginal and oral swabs. Ms. Ward stated that she did not personally perform the DNA testing of the swabs. Mr. Stafford objected to Ms. Ward testifying about the DNA tests based on *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct.

1354, 158 L. Ed. 2d 177 (2004) and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). The trial court overruled the objection based on the appellate court decision of *State v. Lui*, 153 Wn. App. 304, 221 P.3d 948 (2009), *aff'd*, 179 Wn.2d 457, 315 P.3d 493 (2014).

Ms. Ward testified that the person who personally tested the swabs no longer worked for Orchid Cellmark. She also testified that each case processed in her lab goes through a significant review process. Ms. Ward explained that she reviews all work in the lab with a second review completed by another person. Ms. Ward testified that for Mr. Stafford's case, she reviewed the entire case file sent to her by the Yakima Police Department and then generated a report. Ms. Ward was one of the reviewers for every report that was submitted for Mr. Stafford's case and personally signed the reports before sending them.

Ms. Ward testified that DNA was found on the swabs of Ms. Yandell's mouth and her vagina, and this DNA matched (to a high mathematical probability) Mr. Stafford's DNA profile. Regarding these results, Ms. Ward testified that she did not simply rely on the conclusions made by other analysts. Rather, she came to her own conclusions. In reviewing Mr. Stafford's case, Ms. Ward found no evidence of contamination. Also, she

11

found no inconsistency in raw data or case file information that caused her professional concern.

After both sides rested, the trial court dismissed the count for first degree rape. However, the court allowed the State to argue the elements of first degree rape to support the aggravating factor for the other count of aggravated first degree murder.

The jury was asked, by special verdict form, to find the aggravating circumstance that the murder was committed in the course of, in furtherance of, or in immediate flight from the crime of first or second degree rape. The jury was instructed on the elements of first degree rape. The jury was also instructed in pertinent part regarding the special verdict form:

> Because this is a criminal case all twelve of you must agree in order to answer the special verdict form. In order to answer the special verdict form "yes", you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. If you have reasonable doubt as to the question, you must answer "no".
> Because this is a criminal case, each of you must agree for you to return a verdict. When all of you have so agreed, fill in the proper form of verdict or verdicts to express your decision.

Clerk's Papers (CP) at 43-44. Mr. Stafford did not object to these instructions.

The jury found Mr. Stafford guilty of aggravated first degree murder and answered "yes" on the special verdict form. CP at 11. The court imposed a sentence of life without the possibility of parole.

12

## ANALYSIS

*1.    Whether the trial court erred in admitting Mr. Stafford's custodial statements*

We review a trial court's challenged findings of fact from a CrR 3.5 suppression

hearing for substantial evidence. *State v. Grogan*, 147 Wn. App. 511, 516, 195 P.3d 1017

(2008). "'Substantial evidence is evidence sufficient to persuade a fair-minded, rational

person of the truth of the finding.'" *Id.* (quoting *State v. Solomon*, 114 Wn. App. 781,

789, 60 P.3d 1215 (2002)). We apply de novo review to the court's challenged

conclusions of law that are derived from the findings of fact. *Id.* (quoting *Solomon*, 114

Wn. App. at 789).

Mr. Stafford contends that once he made even an equivocal request for an attorney

during the police interrogation, the officer was prohibited from continuing the

interrogation and could only ask questions clarifying his request.

The Fifth and Sixth Amendments to the United States Constitution guarantee the

right to counsel. The Fifth Amendment prohibition against compelled self-incrimination

requires that custodial interrogation be preceded by advice to the accused that he or she

has the right to remain silent and the right to the presence of an attorney. *Miranda v.

Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Once the right to

counsel is invoked, the police cannot initiate further interrogation or seek a waiver until

the suspect has an opportunity to meet with counsel and, further, that counsel must be present during any future interrogation. *State v. Warness*, 77 Wn. App. 636, 639, 893 P.2d 665 (1995).

A defendant's request for an attorney must be unequivocal. *State v. Nysta*, 168 Wn. App. 30, 41, 275 P.3d 1162 (2012). To be unequivocal, the defendant must sufficiently and clearly articulate his desire to have counsel present so that a reasonable police officer under the circumstances would understand the statement to be a request for an attorney. *Id.* (quoting *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994)). The courts look to the specific wording of the accused's statement to police and the circumstances leading up to the request to determine whether the accused unequivocally invoked his or her right to counsel. *Smith v. Illinois*, 469 U.S. 91, 97-98, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984).

Where an accused makes an ambiguous or equivocal statement regarding the invocation of his or her rights, officers may carry on questioning. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 682, 327 P.3d 660 (2014). Law enforcement officers have no obligation to ask clarifying questions or to cease the interrogation. *Id.* "If a defendant fails to unequivocally invoke his *Miranda* rights, a waiver may be inferred when a defendant freely and selectively responds to [further] police questioning." *Id.* at 687.

14

Mr. Stafford did not invoke his right to counsel in the beginning of the interview. He did not make an unequivocal request when he said that he understood that he should have an attorney present. Nor did he make an unequivocal request when he refused to sign the consent form. Mr. Stafford's continuing to answer police questions allows us to infer his nonassertion of his rights.

Even if the request was equivocal, the State did not have a duty to stop interrogation and ask for clarification simply because he had not expressly waived his rights. "A suspect may choose to invoke [*Miranda*] rights at any time prior to or during questioning." *Id.* at 682. *Miranda* rights must be invoked unambiguously. *State v. Piatnitsky*, 180 Wn.2d 407, 413, 325 P.3d 167 (2014), *cert. denied*, 135 S. Ct. 950 (2015). Accordingly, a defendant's request for an attorney must be unambiguous, regardless of when the request is made. Law enforcement does not need to ask for clarification on whether the defendant is invoking *Miranda* rights. *Id.* at 415. Here, there was no need for Lieutenant Wentz to ask for clarification of Mr. Stafford's statement given during the advisement of rights.

The court properly concluded that Mr. Stafford invoked his right to have counsel present during questioning when he said "I need an attorney, you know?" RP at 65. Prior to this statement, Mr. Stafford did not invoke his *Miranda* right to counsel but, instead,

15

waived the right by voluntarily answering Lieutenant Wentz's questions. The trial court

did not err in admitting Mr. Stafford's statements. Mr. Stafford's right to counsel was not

violated.

2.   *Whether the trial court's decision to admit the forensic scientist's DNA testimony violated Mr. Stafford's constitutional right to confront his accuser*

We apply de novo review to confrontation clause challenges. *State v. Jasper*, 174

Wn.2d 96, 108, 271 P.3d 876 (2012). Mr. Stafford contends that Ms. Ward's testimony

violated the confrontation clause because she testified about the DNA analysis and match

with Mr. Stafford even though she was not the person who performed the DNA tests.

The Sixth Amendment confrontation clause provides that in all criminal

prosecutions, the accused shall enjoy the right to be confronted with the witnesses against

them. U.S. CONST. amend. VI. This right is binding on the states through the Fourteenth

Amendment. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923

(1965). Similarly, article I, section 22 of the Washington Constitution provides that in

criminal prosecutions, the accused shall have the right to meet the witnesses against him

face to face. Here, the United States Constitution and the Washington Constitution

compel the same result. *See Lui*, 179 Wn.2d at 468.

The confrontation clause prohibits the admission of testimonial statements against

a defendant unless the witness making the statements appears at trial or the defendant has

16

a prior opportunity for cross-examination. *Melendez-Diaz*, 557 U.S. at 309. Testimonial statements include documents created solely for an evidentiary purpose, made in the aid of a police investigation. *Bullcoming v. New Mexico*, __ U.S. __, 131 S. Ct. 2705, 2717, 180 L. Ed. 2d 610 (2011). A witness is a declarant who makes a factual statement to a tribunal. *Lui*, 179 Wn.2d at 482. "If the witness's statements help to identify or inculpate the defendant, then the witness is a 'witness against' the defendant." *Id.*

The Washington Supreme Court in *Lui* determined that the confrontation clause is not violated when an expert witness at trial presents an independent DNA analysis based on data generated by work of others in the DNA testing process. "[T]he DNA testing process does not become inculpatory and invoke the confrontation clause until the final step, where a human analyst must use his or her expertise to interpret the machine readings and create a profile." *Id.* at 486. When DNA evidence is presented, the witness against the defendant is the final analyst who examines the machine-generated data, creates a profile, and makes a determination that the defendant's profile matches some other profile. *Id.* at 489.

"An expert witness may not parrot the conclusions of others and circumvent the confrontation clause[.] An expert may, however, rely on the work of laboratory technicians when reaching his or her conclusion." *Id.* at 484. Other persons who may

have contributed to certifying a DNA match by participating in the DNA testing process are not a witness against a defendant. *Id.* at 486.

Based on *Lui*, the testimony of Ms. Ward regarding the DNA results did not violate the confrontation clause. As an expert witness for the State, Ms. Ward reviewed Mr. Stafford's entire file and generated a report. She also reviewed the reports of others in the lab. From the data, she was able to determine a match between the DNA found on Ms. Yandell and Mr. Stafford's DNA. Ms. Ward did not rely on the conclusions made by other analysts but reached her own conclusions.

The analyst who actually ran the test did not need to be the person who presented the evidence. That analyst was not a witness against Mr. Stafford, but rather facilitated Ms. Ward's role as an expert witness. Mr. Stafford's right to confront each witness against him was not violated by Ms. Ward's DNA testimony.

3.     *Whether the trial court erred when it admitted the new testimony of Theresa LaFray*

Mr. Stafford contends that the testimony of Theresa LaFray should have been excluded because it was irrelevant and its probative value was substantially outweighed by the danger of unfair prejudice. He argues that Ms. LaFray's testimony regarding her encounter with Mr. Stafford was irrelevant because she could not identify the date it occurred. He also argues that the validity of the testimony is questionable because Ms.

18

LaFray did not like Mr. Stafford, was late in the disclosure, and admitted that she came forward only because she was afraid he would not be convicted.

The determination of relevance is within the broad discretion of the trial court and will not be disturbed absent a manifest abuse of discretion. *State v. Swan*, 114 Wn.2d 613, 658, 790 P.2d 610 (1990). Similarly, a determination of whether the probative value outweighs substantial prejudice is within the broad discretion of the trial court and will only be reversed in the exceptional circumstance of a manifest abuse of discretion. *State v. Gould*, 58 Wn. App. 175, 180, 791 P.2d 569 (1990).

Generally, all relevant evidence is admissible and all irrelevant evidence is inadmissible. ER 402. Relevant evidence is any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "Relevancy means a logical relation between evidence and the fact to be established. Any evidence which tends to identify the accused as the person guilty is relevant." *State v. Whalon*, 1 Wn. App. 785, 791, 464 P.2d 730 (1970) (citation omitted). Material evidence is also admissible. *Id.* Material evidence is evidence that logically tends to prove a defendant's connection with a crime either alone or from whatever inferences may be drawn when it is considered with other evidence. *Id.* "Where identity of the perpetrator of a crime is at

19

issue, any evidence tending to identify the accused as the guilty person is relevant." *State v. Coe*, 101 Wn.2d 772, 781-82, 684 P.2d 668 (1984).

Even relevant evidence can be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403. Unfair prejudice is that which is more likely to arouse an emotional response rather than a rational decision by the jury. *Gould*, 58 Wn. App. at 183. Crucial consideration is given to the word "unfair" when applying ER 403 to prejudicial evidence. *State v. Bernson*, 40 Wn. App. 729, 736, 700 P.2d 758 (1985). "In almost any instance, a defendant can complain that the admission of potentially incriminating evidence is prejudicial in that it may contribute to proving beyond a reasonable doubt he committed the crime with which he is charged. Addition of the word 'unfair' to prejudice obligates the court to weigh the evidence in the context of the trial itself, bearing in mind fairness to both the State and defendant." *Id.*

The trial court did not abuse its discretion in allowing the testimony of Ms. LaFray. The testimony that Mr. Stafford came to her house covered in blood on a midsummer night in 1993 was relevant to the crime charged. A logical relation exists between Ms. LaFray's testimony and Mr. Stafford's alleged involvement in Ms. Yandell's death. The validity and credibility of Ms. LaFray's testimony and her alleged bias against Mr. Stafford were questions for the jury. *See State v. Thomas*, 150 Wn.2d 821, 874-75, 83

20

P.3d 970 (2004). Mr. Stafford had the opportunity to challenge the credibility of Ms.

LaFray's statements during cross-examination. *See* ER 611(b). The trial court did not

abuse its discretion when it considered Ms. LaFray's testimony to be relevant.

The trial court also did not abuse its discretion when it determined that the

probative value of Ms. LaFray's testimony was not substantially outweighed by its unfair

prejudice. The fact that Mr. Stafford went to Ms. LaFray's home covered in blood is not

likely to arouse an emotional response rather that a rational decision by the jury. Also,

despite Mr. Stafford's contention, the testimony is not unfairly prejudicial simply because

he considers it to be the only evidence besides the DNA evidence that is indicative of

guilt. While the testimony is naturally prejudicial because it incriminates Mr. Stafford in

the crime charged, this alone is not a reason to conclude that the evidence was *unfairly*

prejudicial. Rather, it was highly relevant information that a jury would likely consider

rationally rather than emotionally. The trial court was well within its discretion when it

determined that the unfair prejudice of the evidence, if any, was not substantially

outweighed by its probative value.

4.   *Whether the State presented sufficient evidence to prove the essential elements of*
     *aggravated first degree murder*

Mr. Stafford contends that the State failed to prove the essential elements of

aggravated first degree murder. He focuses his attention on the elements of identity,

21

causation, intent, and premeditation. He also contends that there is no evidence that

connects him to the murder—that at the most, the evidence shows that he had consensual

sex with Ms. Yandell.

The standard of review for a sufficiency of the evidence challenge in a criminal

case is "'whether, after reviewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt.'" *State v. Bingham*, 105 Wn.2d 820, 823, 719 P.2d 109

(1986) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct.

2781, 61 L. Ed. 2d 560 (1979)). A defendant challenging sufficiency of the evidence

"admits to the truth of the State's evidence and all inferences that can reasonably be

drawn from that evidence." *State v. Gentry*, 125 Wn.2d 570, 597, 888 P.2d 1105 (1995).

We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses,

and the persuasiveness of the evidence. *Thomas*, 150 Wn.2d at 874-75. "[I]nferences

based on circumstantial evidence must be reasonable and cannot be based on

speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

In a criminal prosecution, the Fourteenth Amendment's due process clause

requires the State to prove each essential element of the crime charged beyond a

22

reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L.

Ed. 2d 435 (2000).

The jury instructions contained the essential elements of first degree murder:

> (1) That on or about June 13, 1993, the defendant acted with intent to cause the death of Shawna Yandell;
> (2) That the intent to cause the death was premeditated;
> (3) That Shawna Yandell died as a result of the defendant's acts; and
> (4) That any of these acts occurred in the State of Washington.

CP at 29. The jury was also asked to find the aggravating circumstance that the murder

was committed in the course of, in furtherance of, or in immediate flight from the crime

of first or second degree rape. The evidence is sufficient to establish the elements of

aggravated first degree murder.

*Identity and Causation.* The State presented sufficient evidence to show that Mr.

Stafford caused Ms. Yandell's death. The jury could infer from the evidence that Mr.

Stafford was with Ms. Yandell on the night of her death. Mr. Stafford's DNA taken from

the spermatozoa found in Ms. Yandell's vagina and mouth establishes that he had contact

with her prior to her death. The presence of the spermatozoa also sets the time frame of

the contact. While Dr. Thiersch said that semen could last for up to 7 days in the vagina,

he also testified that the typical time frame was more like 24 hours. Considering that the

autopsy was conducted the morning after Ms. Yandell's body was found, the 24 to 30

23

hour time frame is consistent with Mr. Stafford having contact with Ms. Yandell on the night she died.

The jury could also infer that Mr. Stafford was the person who caused Ms. Yandell's death. The testimony of Ms. LaFray established that Mr. Stafford was seen covered in blood sometime during the summer when Ms. Yandell was killed. Although Mr. Stafford told Ms. LaFray that he was in a fight with a bunch of Mexicans, the fact that he had no wounds on his body, yet was covered in blood, allowed the jury to disbelieve Mr. Stafford's explanation, and conclude that the truth was more sinister. The jury could find that the amount of blood on Mr. Stafford was consistent with the head injury suffered by Ms. Yandell. Furthermore, Mr. Stafford was seen covered in blood close to the location where Ms. Yandell was last seen alive. Ms. LaFray's home was less than one mile from Sportsman's Park.

*Intent.* The State presented sufficient evidence that the person who inflicted Ms. Yandell's injuries had the intent to kill her. The cause of death was blunt force trauma by multiple blows to the head. The force was strong enough to fracture her skull more than once. The jury could find that a person had to act with intent to cause such wounds. Also, Ms. Yandell had multiple scrapes and bruises on her body that Dr. Thiersch testified were consistent with defensive wounds. The defensive wounds do not point to an

accidental death but instead an intentional act. Considering that the jury could infer that Mr. Stafford was present with Ms. Yandell on the night of her death and that he in fact did cause her death, Ms. Yandell's injuries allowed the jury to also conclude that Mr. Stafford acted with the requisite intent to kill.

*Premeditation.* The State also presented sufficient evidence of premeditation. "Premeditation" involves a deliberate formation of and reflection on the intent to take a human life. *State v. Hoffman*, 116 Wn.2d 51, 82, 804 P.2d 577 (1991). It includes the mental process of thinking beforehand, deliberation, reflection, weighing, or reasoning for a period of time, however short. *Gentry*, 125 Wn.2d at 597-98 (quoting *State v. Ollens*, 107 Wn.2d 848, 850, 733 P.2d 984 (1987)). Premeditation must involve more than a moment in point of time. RCW 9A.32.020(1).

Both direct and circumstantial evidence can be used to establish premeditation. *Bingham*, 105 Wn.2d at 823-24. Circumstantial evidence can be used where the inferences drawn by the jury are reasonable and the evidence supporting the jury's verdict is substantial. *Id.* at 824. Facts that have been found to support an inference of premeditation are multiple wounds inflicted with a knife or other weapon, signs of a struggle, striking a victim from behind, and evidence that sexual assault or robbery was an underlying motive. *Gentry*, 125 Wn.2d at 599.

25

The autopsy evidence shows that Mr. Stafford engaged in some sort of sexual activity with Ms. Yandell and then killed her. There was also evidence of rape as an underlying motive, considering Ms. Yandell's multiple defensive wounds. The numerous defensive and offensive wounds, including both strangulation and severe head wounds, is evidence that the attack was prolonged and savage. As noted above, this type of evidence is sufficient for a jury to infer premeditation.

*Aggravating Factor.* The State also presented sufficient evidence to support the aggravating factor, i.e., that the murder was committed in the course of, or in furtherance of, or in immediate flight from the crime of first or second degree rape. Ms. Yandell was found with Mr. Stafford's spermatozoa in both her vagina and her mouth. Additionally, Ms. Yandell's body showed evidence of defensive wounds. Ms. Yandell did not know Mr. Stafford. From this evidence, the jury could infer that the sex was not consensual and that Mr. Stafford murdered Ms. Yandell in the course of, in furtherance of, or in immediate flight from rape.

In conclusion, after reviewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found, beyond a reasonable doubt, that Mr. Stafford committed aggravated first degree murder.

5.      *Whether the jury instruction, which required the jury to be unanimous when answering the special verdict form, was erroneous*

Mr. Stafford contends that the trial court improperly instructed the jury that a unanimous decision was needed to answer "no" on the special verdict form. Instead, he contends that trial court was required to give a nonunanimity instruction as required by *State v. Bashaw*, 169 Wn.2d 133, 146-47, 234 P.3d 195 (2010), *overruled by State v. Guzman Nuñez*, 174 Wn.2d 707, 285 P.3d 21 (2012).

We review alleged errors of law in jury instructions de novo. *Boeing Co. v. Key*, 101 Wn. App. 629, 632, 5 P.3d 16 (2000). Failure to timely object usually waives the issue on appeal, including issues regarding instructional errors. RAP 2.5(a); *State v. Williams*, 159 Wn. App. 298, 312, 244 P.3d 1018 (2011). This court has held that a trial court's failure to instruct a jury that it could be nonunanimous to acquit a defendant of an aggravating factor is not an issue of constitutional magnitude. *State v. Guzman Nuñez*, 160 Wn. App. 150, 159, 162-63, 248 P.3d 103 (2011), *aff'd in part by Guzman Nuñez*, 174 Wn.2d 707.

Mr. Stafford did not object to the unanimity instruction and, therefore, waives the right to raise the issue on appeal. In any case, his challenge to the jury instruction fails.

Prior to the Washington Supreme Court's recent decision in *Guzman Nuñez*, the court in *Bashaw* recognized the nonunanimity rule developed in *State v. Goldberg*, 149

27

Wn.2d 888, 72 P.3d 1083 (2003), that "a unanimous jury decision is not required to find that the State has failed to prove the presence of a special finding increasing the defendant's maximum allowable sentence." *Bashaw*, 169 Wn.2d at 146. However, in *Guzman Nuñez*, our Supreme Court reconsidered and overruled the nonunanimity rule in *Bashaw*. *Guzman Nuñez*, 174 Wn.2d at 709. The *Guzman Nuñez* court concluded that such a rule "conflicts with statutory authority, causes needless confusion, does not serve the policies that gave rise to it, and frustrates the purpose of jury unanimity." *Id.* at 709-10. The court concluded that the challenged jury instructions, which required a unanimous "yes" or "no" decision on the special verdict form, were correct. *Id.* at 710-11, 719. Here, based on *Guzman Nuñez*, the trial court correctly instructed the jury that it had to unanimously agree "yes" or "no" when answering the special verdict form.

*Statement of Additional Grounds for Review*

In his statement of additional grounds for review, Mr. Stafford contends that his counsel was ineffective for allowing the court to charge him with rape even though the prosecution was barred by the statute of limitations.

"To demonstrate ineffective assistance of counsel, a defendant must make two showings: (1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and

28

(2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (emphasis in original).

Mr. Stafford's counsel was not deficient for consenting to the rape charge. The statute of limitations on the rape charge had not expired. The statute of limitations on first degree rape is 10 years from the date of commission or one year from the date on which the identity of the suspect is conclusively established by DNA testing or photograph, *whichever is later. State v. McConnell*, 178 Wn. App. 592, 603, 315 P.3d 586 (2013) (quoting RCW 9A.04.080), *review denied*, 180 Wn.2d 1015 (2014). Identity is "conclusively established" when "DNA testing matches the DNA profile of an unknown suspect to the DNA profile of a known suspect." *Id.* at 605. Here, Mr. Stafford's identity as a suspect in Ms. Yandell's rape was conclusively established in May 2009, and he was charged later that month. The statute of limitations for the rape charge therefore had not run. His counsel's representation was not deficient.

Mr. Stafford also contends that the chain of evidence for the DNA was broken and that the evidence was tainted. A physical object connected with the commission of a crime must be satisfactorily identified and shown to be in substantially the same condition

29

as when the crime was committed before it may properly be admitted into evidence. *State v. Campbell*, 103 Wn.2d 1, 21, 691 P.2d 929 (1984). "'A failure to present evidence of an unbroken chain of custody does not render an exhibit inadmissible if it is properly identified as being the same object and in the same condition as it was when it was initially acquired by the party.'" *State v. Picard*, 90 Wn. App. 890, 897, 954 P.2d 336 (1998) (quoting *State v. DeCuir*, 19 Wn. App. 130, 135, 574 P.2d 397 (1978)). The witness testifying to the chain of custody does not need to positively identify the challenged evidence and eliminate every possibility of substitution or alteration. *State v. Roche*, 114 Wn. App. 424, 436, 59 P.3d 682 (2002).

Minor discrepancies or uncertainty on the part of the witness affect the weight of the evidence and not admissibility. *Id.* (quoting *Campbell*, 103 Wn.2d at 21). "Evidence of sloppy police work in gathering physical evidence, such as fingerprints and DNA samples, or in establishing chain of custody generally is relevant and admissible." *State v. Rafay*, 168 Wn. App. 734, 803, 285 P.3d 83 (2012).

The evidence identification report produced by Mr. Stafford in his statement of additional grounds does not show a broken chain of custody. The report documents how evidence technician Kristen Drury tracked down the stored evidence from Ms. Yandell's case and her difficulties in locating the evidence, but it does not show that the chain was

broken. Furthermore, the chain of custody issue was appropriately addressed in the trial court. Ms. Drury appeared at trial and was subject to cross-examination regarding interruptions in the chain of custody. Mr. Stafford had the opportunity to discredit the evidence based on the difficulty in locating it. The evidence was properly admitted.

Affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____        _____
Siddoway, C.J.                 Fearing, J.

31