IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 79723-9-I |
| Respondent, | |
| v. | |
| DAVID PHILLIP SCHLOSSER, | UNPUBLISHED OPINION |
| Appellant. | |

BOWMAN, J. — David Phillip Schlosser appeals his jury conviction for rape of a child in the first degree. Schlosser argues the trial court erred when it refused in camera review and inspection of counseling records, violated his right to confrontation, improperly commented on the evidence, deprived him of his right to effective assistance of counsel, violated his right to a fair trial by committing cumulative error, and imposed invalid and unconstitutional conditions of community custody. We affirm the conviction but remand to clarify a community custody condition.

FACTS

Stephanie is the mother of A.D., born in October 2003.[1] Schlosser and Stephanie began dating when A.D. was about a year old and married in 2007.

---

[1] We use the initials of the minors named in this opinion and refer to the adult relatives of the victim by first name only to protect the privacy of the minors and the victim, and mean no disrespect by doing so.

Citations and pin cites are based on the Westlaw online version of the cited material.

They had two children together, I.S. and L.S. The family dynamic was tumultuous, marked by instances of physical abuse, domestic violence, and multiple contacts with Child Protective Services (CPS). Stephanie said that Schlosser was the "primary disciplinarian" for the children and "very harsh" on A.D., including "hitting and kicking her." When Stephanie tried to intervene, Schlosser told her she "didn't know what good parenting was."

A.D. said that for as long as she could remember, Schlosser "didn't really like me, and wasn't very nice to me." At first, he "just" yelled at her, called her names like "moron," or "ma[d]e fun of how" she looked. If she cried, he locked her in the garage with the lights off. After the age of five, the "discipline increase[d]" and became "more violent," including shoving her, pinning her against the wall, sitting on top of her, slapping her in the face, and punching her all over her body. Schlosser also used a belt or wet towel to hit A.D. "a few times a week." A.D. said that "[i]t felt like everything I did kind of like he would get mad at me about just the smallest things."

According to A.D., at some point in 2009 when she was about six years old, Schlosser began "weird[ly]" rubbing her buttocks with his hands, and then things "kind of like escalated." She recalled an instance when Schlosser "got mad" at her, "pinned [her] against the wall," then "reached down [her] pants" and "touched [her] vagina." A.D. said that "a touch like that" started "just occasionally," then it escalated to "once or twice a week." A.D. never told Stephanie about Schlosser inappropriately touching her because she was

2

"scared" of what would happen if she did, especially getting "wors[e] punishment or more punishment."

A.D. also described a 2011 incident after the family moved from an apartment to a three-level house in Issaquah. Schlosser walked into the bathroom while she was bathing and digitally penetrated her vagina. Schlosser had not touched her like that before. A.D. said Schlosser "told me not to tell my mom."

One night in March 2013, A.D. walked upstairs from her first-floor bedroom as she had done many times before. She was crying and wanted to sleep on the third floor of the house with "everybody else." A.D. described Schlosser "screaming at me to shut up, and go back to my room." When she did not immediately leave, Schlosser grabbed A.D.'s arm "hard," walked her down to her room, and "told [her] to pull off [her] pants." A.D. was on the ground on her hands and knees. A.D. said Schlosser "started whipping me with the belt like he would do." And then he raped her for about 10 minutes. When A.D. used the bathroom later that night, "it hurt" and she noticed she was bleeding from her vaginal area. Because A.D. "was scared," she did not tell Stephanie.

The next day, A.D. took a bath and "started bleeding again." A.D. wanted her mother to look at the injury and "make sure that [she] was okay," so A.D. told Stephanie that "I had fallen down the stairs, and that I hurt myself." A.D. stated that she could not tell Stephanie "what actually happened" because Schlosser "would get in trouble," and she was "worried about . . . everybody in my

house . . . being safe." Stephanie then took A.D. to see pediatrician Dr. Laurie Diem. A.D. also told Dr. Diem that she fell down the stairs.

Dr. Diem observed a laceration and bruising in A.D.'s vaginal area, noticed no other injuries on A.D.'s body, and believed falling down the stairs conflicted with A.D.'s injuries. She then reviewed A.D.'s "whole medical history" and "saw several previous emergency room visits for fractures" and "broken bones." The number of A.D.'s injuries "was another red flag" in Dr. Diem's opinion. Because of suspicions of sexual abuse, Dr. Diem reported the injuries to CPS.

Days later, A.D. underwent another examination with pediatrician and child abuse specialist Dr. Rebecca Wiester. Dr. Wiester concluded that the vaginal laceration injury she observed reflected a "straddle injury." Dr. Wiester believed that A.D.'s injuries "can be accidental," including "an awkward fall," with "no other visible signs of injury." A.D. did not tell either doctor that Schlosser sexually assaulted her.

Within a month of the rape in A.D.'s bedroom, Schlosser told A.D. to join him in the master bedroom so they could watch television together, which he had done before. The two were home alone. After A.D. lay on the bed, Schlosser raped her. Schlosser told her that "this is what dads and daughters do."

In the two months that followed, life was "[a]wful" for Stephanie. Schlosser "was berating [her] everyday" and "treat[ing] [A.D.] horribly" because "[n]othing was ever good enough." Schlosser and Stephanie separated in June 2013 and she moved out of the house. They completed their divorce in February 2016. At

4

first, they shared custody of the three children. But soon, A.D. "wanted nothing to do with that" and stopped seeing Schlosser entirely.

In October 2016, A.D.'s boyfriend C.F. approached her about having sexual intercourse. A.D. text messaged C.F. that she did not want to have sex with him because Schlosser had raped her "more times than [she] could count." That same month, A.D. had a text message conversation with her best friend J.B. about why she broke up with C.F. She eventually told J.B. that she "was raped" but did not tell J.B. who did it. J.B. guessed "it was Dave," and A.D. admitted Schlosser had raped her "multiple times."

J.B. was "very upset" and told her mother Deb. Deb then called A.D.'s grandmother Jillian and told her about the rapes. Jillian told her counselor about Deb's call, who then made a mandatory report to CPS. The next day, Jillian told A.D. that she knew Schlosser had sexually abused her,[2] and A.D. started to cry. A.D. admitted that Schlosser sexually assaulted her and later told Stephanie too.

The police and CPS interviewed A.D. and several family members and friends. At first, A.D. disclosed only the 2013 rape in the master bedroom. Eventually, she disclosed that before raping her, Schlosser had repeatedly grabbed her buttocks and vagina for years. Dr. Wiester also met with A.D. again after her 2016 disclosure. During the second interview, A.D. told Dr. Wiester that Schlosser raped her one time.

In November 2016, the State charged Schlosser with rape of a child in the first degree (count 1) and child molestation in the first degree (count 2) for

---

[2] Jillian told A.D. only that "I know" and did not discuss any details of the sexual abuse at that time.

sexually assaulting A.D. from 2011 to 2013 when she was between the ages of 8 and 10 years old.  Schlosser pleaded not guilty.  After more interviews, A.D. disclosed the 2009 incident in the bathtub and the 2013 rape in her bedroom. The State added another count of rape of a child in the first degree (count 3) and amended the charging period on all counts from 2009 to 2013 when A.D. was between 6 and 10 years old.

During pretrial discovery, Schlosser issued a notice of intent to subpoena A.D.'s mental health counseling records from licensed mental health counselor Laura Franco.[3]  Schlosser specifically sought "[a]ny and all records related to A.D." and "any other written reports which contain any of the following":

    a.  Any reference to the defendant David Schlosser, [REDACTED], as well as any reference to [REDACTED];
    b.  Any reference to statements made by A.D. describing any alleged acts of abuse of A.D. by David Schlosser; and
    c.  Any reference to any other statements made by A.D. about David Schlosser; and
    d.  Any reference to any times A.D. has been dishonest or has lied to anybody; and
    e.  Any reference to I.S. or L.S.; and
    f.  Any reference to any conversations A.D. had with anybody else about abuse; and
    g.  Any reference to any conversations A.D. had with anybody about sex and boundary issues; and
    h.  Any reference to any allegations of inappropriate behaviors or abuses committed against A.D. by anyone other than David Schlosser.[4]

A.D. moved for a protective order, arguing that Schlosser lacked a "sufficient 'factual predicate' " for the records and that "[t]he notices contain

---

[3] Schlosser also issued a similar notice for all of A.D.'s educational records, which the trial court allowed and is not at issue on appeal.

[4] Alterations in original.

categorical, generalized descriptions of records which could apply to any case and are essentially dragnets trolling for any mention of enumerated key words."

Schlosser responded, saying he "believes" the counseling records "will likely have references" to reported CPS incidents, will "possibly" reference "additional incidents in which A.D. believes" he "abused or neglected" her, and will "contain evidence of A.D.'s bias against" him. Schlosser also believed that A.D. "never mentioned the allegations of sexual abuse at issue in this case prior to the fall of 2016 to anybody, including Ms. Franco, to whom she reported other alleged abuses." Schlosser acknowledged, "Obviously, defense counsel cannot prove that these records contain evidence of A.D.'s bias against [him]," which is why he asked to "review them or, at the very least, for the Court to review them in camera."

After considering the pleadings and oral argument, the trial court issued an order granting A.D.'s motion for a protective order as to her counseling records, denying Schlosser's motion for in camera review, and quashing the subpoena for those records. During consideration of the parties' motions in limine, the court expanded its ruling to prohibit any questioning of A.D. about whether she told Franco of the sexual assaults.

The case proceeded to jury trial in November 2018. Several witnesses testified, including A.D., Stephanie, Jillian, C.F., J.B., Dr. Diem, Dr. Wiester, a child interview specialist, three Issaquah Police Department detectives, and Schlosser. Schlosser testified he never had sexual intercourse with A.D., never walked into the bathroom while she was bathing, never invited her to watch

television in his bed, never called her names, never struck her out of anger, and never grabbed her buttocks or vagina.

In closing, defense counsel emphasized Schlosser's theory that A.D. was not credible, that her claims "are unreasonable," and that A.D.'s testimony "can't possibly amount to proof beyond a reasonable doubt." Counsel highlighted inconsistent statements A.D. gave to several friends, relatives, law enforcement, and medical professionals about the number of times Schlosser raped her. Counsel then argued, "[T]he most important thing you need to remember about [A.D.] is that she had no hesitation lying to all these different people about what had happened."

The jury found Schlosser guilty of rape of a child in the first degree as charged in count 3 but could not reach a verdict on the remaining charges. The trial court declared the jury deadlocked as to the charges in counts 1 and 2, ordered a mistrial on those two charges, and granted the State's motion to dismiss those counts. Schlosser then moved for a new trial, claiming the trial judge made an improper comment on the evidence when the judge "admonished defense counsel" in front of the jury and "instructed him not to discuss Mr. Schlosser's testimony during a court recess." The court denied Schlosser's motion.

At sentencing, the trial court imposed an indeterminate sentence within the standard range, lifetime community custody, a lifetime no-contact order with A.D. and "[a]ny minors without supervision," and several crime-related conditions of community custody. Schlosser appeals.

ANALYSIS

Schlosser seeks reversal of his conviction, arguing the trial court (1) erred when it refused in camera review of A.D.'s counseling records, (2) violated his right to confrontation when it forbade cross-examining A.D. about not telling her counselor that Schlosser raped her, (3) improperly commented on the evidence, (4) deprived him of effective assistance of counsel, (5) violated his right to a fair trial because of cumulative error, and (6) imposed invalid and unconstitutional conditions of community custody.[5]

In Camera Review of Counseling Records

Schlosser argues the trial court abused its discretion and violated due process and the rules of discovery by denying in camera review of A.D.'s counseling records. The State argues the trial court properly denied review because Schlosser's request did not include a "particularized showing that the records were likely to contain material facts useful to his defense." We agree with the State.

Due process assures a criminal defendant "a right of access to evidence that is 'both favorable to the accused and material to guilt or punishment.' " State v. Knutson, 121 Wn.2d 766, 772, 854 P.2d 617 (1993) (quoting Pennsylvania v.

---

[5] In his opening brief, Schlosser also asserts the trial court denied him his right to a fair and impartial jury by permitting a biased juror to be seated (assignment of error 1), erred by denying his motion for new trial (assignment of error 6), and violated his right to appeal because it failed to preserve a record of jury selection adequate for appellate review (assignment of error 7). Schlosser later conceded that the juror he alleged to be biased "was not seated on this jury." The record reflects defense counsel removed this juror from the jury panel with a peremptory challenge. The record and Schlosser's concession resolve the issues related to assignments of error 1 and 7. We also do not reach assignment of error 6 because Schlosser fails to support it with argument or authority. See RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Ritchie, 480 U.S. 39, 57, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987)). But mental health counseling records are privileged under RCW 5.60.060(9),[6] requiring the court to balance the privacy interest in those records with the usefulness of the evidence. See CrR 4.7(e); State v. Kalakosky, 121 Wn.2d 525, 547-48, 852 P.2d 1064 (1993) (instructing that the Victims of Sexual Assault Act, chapter 70.125 RCW, "clearly requires that the defendant make some statement showing need for the counseling notes before the victim's right to privacy is overcome").

"[T]o obtain in camera review of privileged records a defendant must establish that the records are at least material." State v. Diemel, 81 Wn. App. 464, 468, 914 P.2d 779 (1996); see Ritchie, 480 U.S. at 57; Kalakosky, 121 Wn.2d at 550. This involves a " 'plausible showing' " that the evidence is both material and favorable. State v. Gregory, 158 Wn.2d 759, 791, 147 P.3d 1201 (2006)[7] (quoting Ritchie, 480 U.S. at 58 n.15), overruled in part on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014).

Evidence is material only if there is a "reasonable probability" that it will impact the outcome of a trial. Gregory, 158 Wn.2d at 791. "A reasonable probability is probability sufficient to undermine confidence in the outcome." Gregory, 158 Wn.2d at 791. A defendant must show more than a mere possibility of materiality. Knutson, 121 Wn.2d at 773. "A claim that privileged

---

[6] In pertinent part, RCW 5.60.060(9) states:

A mental health counselor . . . may not disclose, or be compelled to testify about, any information acquired from persons consulting the [counselor] in a professional capacity when the information was necessary to enable the [counselor] to render professional services to those persons.

This provision identifies several exceptions, but none of them includes subpoenas in criminal matters. See RCW 5.60.060(9)(a)-(e).

[7] Internal quotation marks omitted.

files might lead to other evidence or may contain information critical to the defense is not sufficient to compel a court to make an in camera inspection." Diemel, 81 Wn. App. at 469.

We review a trial court's decision whether to conduct in camera review of evidence for abuse of discretion. Diemel, 81 Wn. App. at 467. A court abuses its discretion when it bases its decision on untenable grounds or reasons. State v. Vars, 157 Wn. App. 482, 494, 237 P.3d 378 (2010). This standard of review allows the trial court to act within a range of acceptable choices. State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012). We will not find an abuse of discretion just because we may have decided the issue differently. L.M. v. Hamilton, 193 Wn.2d 113, 134, 436 P.3d 803 (2019). Here, the trial court's decision to deny in camera review of A.D.'s counseling records was within a range of acceptable choices.

Schlosser claims that the "significance of A.D.'s work with Laura Franco is what [A.D.] did not tell her: that she was repeatedly raped and molested by her stepfather."[8] But the record is clear that A.D. did not disclose the rapes to anyone until October 2016 when A.D. told C.F. and J.B. She then told Jillian, Stephanie, and Dr. Wiester. A.D. admitted that at first, she disclosed only the 2013 rape in the master bedroom to authorities. A.D. testified that she did not disclose the incident in the bathtub until a May 2017 interview with police. She

---

[8] Quoting Gregory, 158 Wn.2d at 795, Schlosser also argues that in camera review " 'might have led to witnesses that could confirm or refute' A.D.'s claim that [Schlosser] raped her in 2013" or that A.D. "did not feel safe enough to tell anyone until after her mother's divorce was final." But Schlosser offers no plausible explanation why he expects the records would yield such information.

also admitted that she did not disclose the rape in her bedroom until an interview in February 2018. So counseling records from sessions in 2014 and 2015 showing that A.D. did not disclose Schlosser repeatedly raped and molested her would have been of little value to his defense. Schlosser had ample evidence to argue his theory of the case and to impeach A.D. based on the timing and details of her disclosures. The trial court did not abuse its discretion in denying Schlosser's request for in camera review of A.D.'s counseling records.[9]

Right to Confrontation

Schlosser claims the trial court violated his constitutional right to confrontation by not allowing him to cross-examine A.D. about whether she told Franco that Schlosser sexually abused her. We disagree.

We review a trial court's decision to admit or exclude evidence and its limitation on the scope of cross-examination for manifest abuse of discretion. State v. Gunderson, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014); State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). Both the federal and state constitutions guarantee the right to confront and cross-examine adverse witnesses. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; Darden, 145 Wn.2d at 620. But the right to cross-examination is not absolute. Darden, 145 Wn.2d at 620. "The confrontation right and associated cross-examination are limited by general considerations of relevance." Darden, 145 Wn.2d at 621. A trial court may reject lines of questions "that only remotely tend to show bias or

---

[9] Schlosser also argues that the State should have disclosed A.D.'s counseling records under CrR 4.7(a)(3) or CrR 4.7(d). Because he did not raise this argument in his pleadings for in camera review or at oral argument below, we decline to address it under RAP 2.5(a). See also CrR 4.7(e)(2) (trial court's discretion to deny disclosure).

prejudice." State v. Kilgore, 107 Wn. App. 160, 185, 26 P.3d 308 (2001).  The more important the witness is for the prosecution's case, the more latitude the defense should have to explore issues of motive, bias, and credibility.  Darden, 145 Wn.2d at 619.

Here, Schlosser sought to ask A.D., "[Y]ou did not tell anyone — you did not tell your counselor, Laura Franco, about this incident, did you."  The trial court ruled that Schlosser could not ask A.D. the question "based upon [the prior judge]'s ruling, which did not allow the disclosure of any of the conversations" between A.D. and Franco.

Schlosser argues that the court should have permitted him to question A.D. about his suspicion that she failed to disclose the abuse to her counselor because "[u]nlike individual doctors she saw years earlier, [A.D.] had a long-term relationship with this counselor" and was more likely to have disclosed to Franco if Schlosser sexually assaulted her.  But as already discussed, A.D. admitted that she did not disclose the rapes to anyone until 2016, which was well after the 2014 to 2015 period of counseling.  A.D. testified that before 2016, she did not disclose the sexual assaults to her mother, other family members, doctors, friends, or anyone else because she was "scared" Schlosser would hurt her worse than he had already, and she was "worried" about the effect it would have on "everybody in my house" because Schlosser "would get in trouble."  Even after A.D. disclosed the rapes to J.B. in October 2016, the evidence and testimony established that she insisted J.B. "keep that a secret."

13

Eliciting testimony that A.D. did not tell Franco about the sexual abuse would have added little probative value when considered in the context that she did not disclose the abuse to anyone. We cannot say that the trial court made its decision to exclude Schlosser's question on untenable grounds or for untenable reasons.

Schlosser also contends that the trial court's decision violated his constitutional right to present a defense. Again, we disagree.

"In some instances regarding evidence of high probative value, 'it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and [Wash.] Const. art. I § 22.' " State v. Arndt, 194 Wn.2d 784, 812, 453 P.3d 696 (2019) (quoting State v. Hudlow, 99 Wn.2d 1, 16, 659 P.2d 514 (1983)). Determining whether the exclusion of evidence qualifies as a violation of the Sixth Amendment right to present a defense is a legal question that we review de novo. Arndt, 194 Wn.2d at 797-98.

Here, the trial court prevented Schlosser from cross examining A.D. on a discrete topic. Its ruling did not deprive Schlosser of his right to present a defense. The state's interest in protecting A.D.'s privileged counseling information is compelling. Under the circumstances of this case, Schlosser's need to ask the question he desired does not outweigh the state's interest. As discussed above, the testimony would have added little probative value given all of the other testimony. The jury did not need to hear A.D. admit once more that she failed to disclose the sexual assaults prior to October 2016.

14

Judicial Comment on the Evidence

Schlosser contends that the trial court improperly commented on the evidence when it "[a]ccused" his lawyer "of [i]ntending to [c]oach" his testimony in front of the jury. We disagree.

"Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. A court comments on the evidence "if the court's attitude toward the merits of the case or the court's evaluation relative to the disputed issue is inferable from the statement." State v. Lane, 125 Wn.2d 825, 838, 889 P.2d 929 (1995). "It is sufficient if a judge's personal feelings about a case are merely implied." State v. Sivins, 138 Wn. App. 52, 58, 155 P.3d 982 (2007).

We apply a two-step analysis to determine if reversal is required due to a judicial comment on the evidence. State v. Levy, 156 Wn.2d 709, 723, 132 P.3d 1076 (2006). First, we examine the facts and circumstances of the case to determine whether a court's conduct or remark rises to a comment on the evidence. Sivins, 138 Wn. App. at 58. If we conclude the court made an improper comment on the evidence, we presume the comment is prejudicial, "and the burden is on the State to show that the defendant was not prejudiced, unless the record affirmatively shows that no prejudice could have resulted." Levy, 156 Wn.2d at 723.

Schlosser argues the trial court commented on the evidence when defense counsel requested a break during Schlosser's testimony:

> Q.   David, you saw your daughter [I.S.] when she testified here in court?

A. Yes.

Q. Prior to her coming into the courtroom last week, when was the last time you saw her?

A. I haven't seen her in two years.

Q. As far as you know has [I.S.] been living with Stephanie those last two years?

A. Yes.

Q. You heard Stephanie's testimony?

A. Yes.

Q. Did you hear Stephanie testify that she had — you hear Stephanie admit that she had been saying disparaging things about you to the children?

[PROSECUTOR]: Objection.

THE COURT: Sustained.

EXAMINATION BY
[DEFENSE COUNSEL]:

Q. Did you hear Stephanie testify?

A. I heard her. And she said she —

[PROSECUTOR]: Objection.

THE COURT: Sustained.

EXAMINATION BY
[DEFENSE COUNSEL]:

Q. You need a break right now, David?

A. Yeah, that would be better.

[DEFENSE COUNSEL]: Can we have a break?

THE COURT: This isn't a deposition. Does he need a break?

[DEFENSE COUNSEL]: I asked him that, yes, your Honor. May we have a break?

THE COURT: You may not discuss your testimony during the break.

[DEFENSE COUNSEL]: I don't intend to, your Honor.

THE COURT: Okay. All right. Please leave your notebooks in the chairs.

The jurors then left the courtroom. Before taking a recess, Schlosser's attorney complained that the court was not treating him fairly:

[DEFENSE COUNSEL]: I find it very difficult to put on my case with the Court making the kinds of comments that the Court has made in front of the jury. You have constantly, from the beginning of this trial, made comments to the jury criticizing me, making suggestions on what I should do. And this last comment where you suggested in front of the jury that I might be wanting to

16

confer with my client, and go over his testimony because he wanted a break because he broke down when he talked about his children left all of these jurors with the impression that I am trying to do something inappropriate and I greatly resent that. It's very difficult for me to go forward in that context.

THE COURT: That's the only specific you have given [defense counsel], and it is my impression that you transparently asked for a break like somebody would in a deposition when they want to talk to their client. Mr. Schlosser got upset, but then he recovered. And I saw no reason why you were asking for the break, and it looked like you were stumped as to what question to ask next because I sustained an objection, and that is why I did that. I have never done that before, [defense counsel], in 20 years.

[DEFENSE COUNSEL]: You didn't have to do it in front of the jury, your Honor.

THE COURT: All right. Well, [defense counsel], if you need a break, it would be better to do a side bar, and ask for a break [for your client], if you need that. But that is what happened. Other than that, the only interruptions I have been doing, [defense counsel], is I need to protect the court reporter, and I think for both counsel there have been times when I have stopped both of you in order to make sure that the witnesses were fairly reported. I have stopped [the prosecutor], and I have stopped you during different times. I know you took umbrage this morning when I said wait for Mr. Schlosser to answer the questions because I saw you angry, but it's my job to make sure that the record is protected. So that is why I did that this morning.

[DEFENSE COUNSEL]: I understand that. I don't have a complaint about that at all.

THE COURT: Well, that's what I'm hearing you complain about that.

[DEFENSE COUNSEL]: Well, yeah, because of the way you do it in front of the jury. You criticize me. You make it clear to the jury that you are upset with me. Now, I don't know how to respond to an objection that has no basis. When someone says objection without giving a basis, I cannot respond. Objection. Sustained. That's not an appropriate objection, your Honor. An objection needs to have a basis stated because otherwise I have no way to respond. I asked for a side bar because I wanted to make that point so that I could understand the basis of the objection, and when I did that you said — you explained the basis you need to have personal knowledge to me, and instructing me on the law in front of the jury. So, yes. I — think —

THE COURT: And I would do that with any lawyer, [defense counsel], to explain the basis of my ruling. Now, you asked him to comment on the veracity of Stephanie . . . and I

17

sustained the objection. And then you asked him about whether or not she had made a particular statement. So, you know, I think that's pretty obvious. I think the objection is pretty obvious.

[DEFENSE COUNSEL]: It wasn't obvious.

THE COURT: It's common place in many trials for lawyers to make an objection without giving a basis. If I understand what the objection is, I rule instantly. And it's very common.

[DEFENSE COUNSEL]: It's not appropriate. It's not appropriate.

THE COURT: Well, I disagree with you, [defense counsel].

[DEFENSE COUNSEL]: Well, it's your courtroom.

When the parties returned from the recess, the court told defense counsel

it would "tell the jury to disregard any comment that I make, that they should only

be paying attention to the witness's testimony, considering the credibility of the

witnesses." Schlosser's attorney then moved for a mistrial, stating, "I believe that

I have been irreparably damaged." He told the court:

[DEFENSE COUNSEL]: . . . I have been irreparably damaged, and I don't believe that that can be recovered from without a more explicit instruction to the jury.

THE COURT: What instruction would you like me to give?

[DEFENSE COUNSEL]: I think the Court should instruct the jury that you should not have made the suggestion that I had an improper motive and — and to disregard that comment. I think because that's clearly the impression that they have.

[PROSECUTOR]: No objection.

THE COURT: Okay. I will so instruct the jury.

[DEFENSE COUNSEL]: Thank you, your Honor.

The jury returned to the courtroom and the court gave the curative

instruction requested by Schlosser's attorney:

THE COURT: Please come in and be seated. You may all be seated. Members of the jury, let me just repeat my earlier instructions to disregard anything that I say, what the lawyers say. The evidence is the testimony of witnesses, any documents, as you can see there are a number of documents piled up there, that you may receive in evidence to consider. And specifically I should not have made a comment about the motives of [defense counsel] as a

18

> lawyer. So please disregard that comment by me. We are now going to continue the testimony of Mr. Schlosser.
> [DEFENSE COUNSEL]: Thank you, your Honor.

The court's order to Schlosser not "to discuss your testimony" during the break did not amount to a judicial comment on the evidence. The statement did not reveal "the court's attitude toward the merits of the case" or reflect the court's personal opinion of any disputed issue before it. Lane, 125 Wn.2d at 838; see Sivins, 138 Wn. App. at 58. And even if the jury inferred that the court directed its statement toward the motives of Schlosser's attorney, the statement does not warrant reversal unless Schlosser can show that "prejudice resulted, or could reasonably be presumed to have resulted, from such error." State v. Levy, 8 Wn.2d 630, 644, 113 P.2d 306 (1941). Here, there is little likelihood that the court's order not to discuss testimony during a break in the course of a seven-day trial "put the judge's thumb on the credibility scales for the jury . . . against the defense" as claimed by Schlosser. And defense counsel's request for "a more explicit [curative] instruction to the jury," which the court granted, alleviated any potential prejudice caused by the statement. We presume the jury followed the court's instructions. State v. Kalebaugh, 183 Wn.2d 578, 586, 355 P.3d 253 (2015).

Right to Effective Assistance of Counsel

Schlosser claims we should reverse his conviction because the trial court repeatedly interrupted defense counsel, interjected itself, and sustained objections without a stated basis, depriving him of effective assistance of counsel.

"A trial court may exercise reasonable control over the orderly presentation of argument and evidence." Sanders v. State, 169 Wn.2d 827, 851, 240 P.3d 120 (2010). "When considering a procedure 'not regulated or covered by statute, formal rule or precedent,' we review in light of that 'wide discretion.' " Sanders, 169 Wn.2d at 851 (quoting State v. Johnson, 77 Wn.2d 423, 426, 462 P.2d 933 (1969)). However, when a trial court disparages an attorney in front of the jury, it may deprive the defendant of his or her constitutional right to counsel:

> The aid of counsel is guaranteed by the Constitution to every person accused of [a] crime, and this is universally recognized as one of the surest safeguards against injustice and oppression. Any conduct or statement on the part of the court that tends to impair the influence or destroy the usefulness of counsel is palpable and manifest error.

State v. Phillips, 59 Wash. 252, 259, 109 P. 1047 (1910). Again, even when such conduct does occur, reversal is not warranted unless prejudice results. Levy, 8 Wn.2d at 644.

Here, Schlosser argues the trial court "denigrated" defense counsel, "repeatedly demean[ed] counsel, interrupt[ed] his questions, cut him off even without an objection, and sustain[ed] objections without a basis being stated — then criticize[d] counsel for asking for a basis." For instance, he points to the following exchange during defense counsel's opening statement:

> Two years went by from the time of that 2016 until you know, here we are today. And during that time [A.D.]'s story changed. [A.D.]'s story was enhanced. . . .
> And as the story changes, as the story evolves, in February of this year, of 2018, [A.D.] approaches . . . the prosecutor, and has a meeting with him and says oh, you know what? There's something else that happened. And then she describes the thing — the — the other thing that happened. She says you know that — that vaginal injury that I had when I fell down the stairs? That didn't

20

> really happen. She will tell you — she will come into this courtroom
> and she will tell you, I lied about it to Doctor —
>> [PROSECUTOR]: Objection, argumentative.
>> THE COURT: It is argumentative.
>> [DEFENSE COUNSEL]: She —
>> THE COURT: Counsel, you've got to —
>> [DEFENSE COUNSEL]: It's the State's —
>> THE COURT: — be careful.
>> [DEFENSE COUNSEL]: It's the evidence, Your
> Honor. The State — this is what she's going to say. She says she
> lied.
>> THE COURT: The objection is sustained. Please —
>> [DEFENSE COUNSEL]: All right. I'll move on.
>> THE COURT: — <u>stay with the facts</u>. Yes.

Schlosser points to the emphasized language as the court being critical of his attorney. We disagree. The record shows that the court was exercising reasonable control over the evidence by instructing counsel not to argue his case to the jury during opening remarks.[10]

Schlosser also complains that while he was testifying and his attorney was about to show him a recently marked exhibit, the court interrupted by instructing his attorney to "[s]how it to [opposing] counsel." His attorney told the court that he had done so. The court responded, "All right. Thank you." While the record does not reflect when Schlosser's attorney showed the prosecutor the exhibit or whether the court witnessed him do so, this exchange suggests the court did not see it occur. Schlosser again fails to show how the trial court's effort to exercise control over the orderly presentation of evidence impugned his attorney.

---

[10] See State v. Gallagher, 15 Wn. App. 267, 268, 549 P.2d 499 (1976) (purpose of opening statement is to inform jurors how they can follow and understand the evidence as it unfolds during trial, not to argue the merits of the case).

Finally, Schlosser claims the court disparaged his attorney during cross-examination of Stephanie when the court interrupted without an objection by the State:

Q.    Okay.  Was 2013 the worst year of your life?
A.    I would say that the years I lived in [the three-level house in Issaquah] with [Schlosser] were the worst years of my life.
Q.    Okay.  Well —
A.    Some of them.
Q.    The specific reason that 2013 was a bad year was because you had been — let me rephrase that.  Isn't it true that —
       THE COURT:     Didn't I just rule on this, counsel?  Or is there something that — that I don't —
       [DEFENSE COUNSEL]:     I'm sorry?
       THE COURT:     Didn't I just rule on this, counsel?  Or is there something else that I don't —
       [DEFENSE COUNSEL]:     I think you did, but I'm just trying to make sure I'm consistent with your ruling, your Honor.
       THE COURT:     You can't address the topic.
       [DEFENSE COUNSEL]:     May we have a conference?
       THE COURT:     We just discussed this.  Unless it's something new you have.  If there's something new, yes.  But if there is not, I ruled you and [the prosecutor].  But I'm happy to hear more if there's more.
       [DEFENSE COUNSEL]:     Well, I'm really at fault by this, your Honor.  I just want to be clear that I'm consistent with the ruling.  Just a side bar.
       THE COURT:     All right.
       [DEFENSE COUNSEL]:     Thank you.
       THE COURT:     All right.

The parties then discussed the issue at sidebar.[11]

Schlosser's complaint again lacks merit.  The court's comment did not disparage Schlosser's attorney.  Instead, the court interrupted Schlosser's attorney to prevent Schlosser from violating a prior ruling.

---

[11] Five pages earlier in the transcript, Schlosser wanted to question Stephanie on cross-examination about her drug usage during 2013.  The court disallowed the inquiry unless Schlosser could establish "some kind of a nexus."

22

While Schlosser's attorney clearly perceived some of the court's conduct to be too critical and denigrating, the record shows that the court properly managed the proceedings in a manner fair to both parties.  For example, the trial court acted on defense counsel's general objections, interrupted both parties to prevent witnesses and counsel from talking over each other, instructed the prosecutor to "slow down" while examining witnesses, and granted both the prosecutor's and defense counsel's requests for breaks.

The trial court's comments did not deprive Schlosser of effective assistance of counsel because they were an exercise of the court's authority to control the orderly presentation of evidence and argument in the courtroom.  And to the extent that the jury perceived the court's comments as directed toward Schlosser's attorney, Schlosser fails to show any prejudice.  Schlosser's attorney vigorously defended him, attacked A.D.'s credibility, and his advocacy successfully defeated two of the State's three charges.

Cumulative Error

Schlosser contends cumulative error denied him a fair trial.  The cumulative error doctrine applies "when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial."  State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).  Because Schlosser has not identified multiple errors, there cannot be cumulative error.

Conditions of Community Custody

Schlosser contends that the trial court erred by imposing conditions of

community custody that interfere with his fundamental right to parent, that are not

crime-related, and that are unconstitutionally vague.[12] He challenges these

conditions:

> **NO CONTACT**:  For the maximum term of Life defendant shall
> have no contact, direct or indirect, in person, in writing, by
> telephone, or through third parties with:  A.D. [and]
> [X]  Any minors without supervision of a responsible adult who has
> knowledge of this conviction.
> . . . .
> 15.  [X]  Have no direct or indirect contact with minors.
> . . . .
> 17.  [X]  Stay out of areas where children's activities
> regularly occur or are occurring.  This includes parks
> used for youth activities, schools, daycare facilities,
> playgrounds, wading pools, swimming pools being
> used for youth activities, play areas (indoor or outdoor),
> sports fields being used for youth sports, arcades, and
> any specific location identified in advance by [the
> Department of Corrections] or the [community
> corrections officer].

As part of any sentence, a trial court may impose and enforce crime-

related prohibitions.  RCW 9.94A.505(9); State v. Warren, 165 Wn.2d 17, 32, 195

P.3d 940 (2008).[13]  A "crime-related prohibition" is an order of the court

prohibiting conduct that directly relates to "the circumstances of the crime" for

which the offender has been convicted, and may include orders prohibiting

---

[12] The State argues Schlosser waived these challenges under RAP 2.5(a)(3) for failing to object to them at sentencing.  As much as Schlosser argues that the conditions are not crime-related, we agree with the State.  See State v. Casimiro, 8 Wn. App. 2d 245, 249, 438 P.3d 137 (2019) (whether a condition of sentence is crime-related is a question of fact that we will not review for the first time on appeal).  We will however consider contentions that solely present questions of law.  See State v. Bahl, 164 Wn.2d 739, 751-52, 193 P.3d 678 (2008).

[13] Warren cites former RCW 9.94A.505(8) (2003).  The legislature renumbered the relevant subsection to (9) in 2015.  LAWS OF 2015, ch. 287, § 10.

contact. RCW 9.94A.030(10); see Warren, 165 Wn.2d at 33-34. Generally, we review sentencing conditions for abuse of discretion. Warren, 165 Wn.2d at 32. "A court abuses its discretion if, when imposing a crime-related prohibition, it applies the wrong legal standard." In re Pers. Restraint Petition of Rainey, 168 Wn.2d 367, 375, 229 P.3d 686 (2010) (citing State v. Lord, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007)).

Careful review is required however when sentencing conditions may "interfere with a fundamental constitutional right." Warren, 165 Wn.2d at 32. "Conditions that interfere with fundamental rights must be reasonably necessary to accomplish the essential needs of the [s]tate and public order." Warren, 165 Wn.2d at 32. Such conditions "must be narrowly drawn" and "[t]here must be no reasonable alternative way to achieve the [s]tate's interest." Warren, 165 Wn.2d at 34-35.

A. No Contact with Minors

Schlosser argues that the trial court violated his "fundamental constitutional right to the care, custody, and companionship of [his] children" because the court ordered that he have no contact, "direct or indirect, with his own children" so long as they are minors.

Natural parents have a fundamental right in the "care, custody, and management" of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). A trial court may not impose a no-contact order between a parent and child without addressing on the record whether the order is reasonably necessary in scope and duration to prevent harm to the child.

Rainey, 168 Wn.2d at 381-82; State v. DeLeon, 11 Wn. App. 2d 837, 840-41, 456 P.3d 405 (2020).

Here, the trial court's judgment and sentence prohibits Schlosser from contact with "[a]ny minors without supervision of a responsible adult who has knowledge of this conviction." But "Appendix H" to the judgment and sentence precludes "direct or indirect contact with [all] minors." We remand for the trial court to clarify the condition of sentence.

### B. Stay Out of Areas Where Children's Activities Occur

Schlosser also argues that conditions 15 and 17 are unconstitutionally vague "because they do not define [the words] 'minor,' 'children' or 'youth.' " We disagree.

The guarantee of due process requires that laws not be vague. U.S. CONST. amend. XIV, § 1; WASH. CONST. art I, § 3; City of Spokane v. Douglass, 115 Wn.2d 171, 178, 795 P.2d 693 (1990). A condition is unconstitutionally vague if it (1) does not sufficiently define the prohibition so that an ordinary person can understand it or (2) does not provide sufficiently ascertainable standards to protect against arbitrary enforcement. Bahl, 164 Wn.2d at 752-53. But impossible standards of specificity are not required. Douglass, 115 Wn.2d at 179. "If 'persons of ordinary intelligence can understand what the [law] proscribes, notwithstanding some possible areas of disagreement, the [law] is sufficiently definite.' " Bahl, 164 Wn.2d at 754[14] (quoting Douglass, 115 Wn.2d at 179).

---

[14] Alterations in original.

The word "minor" is defined in chapter 9.68A RCW concerning the sexual exploitation of children. See RCW 9.68A.011(5) (defining "minor" as "any person under [18] years of age"). But relevant statutes do not define the words "children" or "youth." When a statute does not define a term, the court may consider its plain and ordinary meaning as in a standard dictionary. State v. Sullivan, 143 Wn.2d 162, 184-85, 19 P.3d 1012 (2001). The dictionary defines "children" as the plural of "child," a "young person of either sex esp[ecially] between infancy and youth" and "a person who has not yet come of age." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 388 (2002). The statutes define coming of age in the state of Washington as 18 years old. See RCW 26.28.010 (defining the "age of majority" as 18 years old). The dictionary defines "youth" as "the time of life when one is young; esp[ecially] **:** a young [person] between the ages of adolescence and maturity." WEBSTER'S, at 2654.

The words "minor" and "children" sufficiently define the scope of prohibited conduct as avoiding areas where the activities of persons under the age of 18 commonly occur. The word "youth," standing alone, does not sufficiently define the scope of the prohibited conduct. But, in deciding whether a term is unconstitutionally vague, we do not consider it in a vacuum; rather, we consider the term in the context in which it is used. Douglass, 115 Wn.2d at 180. Here, condition 17 uses the term "youth" in the context of a conviction for rape of a child. Additionally, the term is used along with the word "children's," which is a commonly understood and easily ascertainable term, and it immediately precedes a description of areas and activities that would commonly be linked to

children or minors—"parks used for youth activities, schools, daycare facilities, playgrounds, wading pools, swimming pools being used for youth activities, play areas (indoor or outdoor), sports fields being used for youth sports, [and] arcades." Considered in context of the entire prohibition, an ordinary person would understand that "youth" refers to minors or children, and the term provides a sufficiently ascertainable standard to protect against arbitrary enforcement.[15]

We affirm Schlosser's jury conviction of one count of rape of a child in the first degree but remand for clarification of one condition of community custody.

_Brunner, J_

WE CONCUR:

_Coburn, J._        _Verellen, J._

---

[15] Citing Packingham v. North Carolina, ___ U.S. ___, 137 S. Ct. 1730, 1737, 198 L. Ed. 2d 273 (2017), Schlosser also claims that condition 17 violates his constitutional right to travel freely because it is not " 'narrowly tailored and directly related to the goals of protecting the public.' " We disagree. The cited quote from Packingham actually reads that the State may "enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor." Packingham, 137 S. Ct. at 1737. Condition 17 is narrowly tailored to serve the important public interest of prohibiting sex offenders from engaging in conduct that often precedes a sexual crime against children—contacting minors in areas where they commonly congregate.

28